## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GEORGE A. SHORT,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **Civil Action No. 05-01034 (RMU)** |
| ) | |
| **MICHAEL CHERTOFF, SECRETARY** ) | |
| **UNITED STATES DEPARTMENT OF** ) | |
| **HOMELAND SECURITY,** ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant respectfully submits this Motion for Summary Judgment.

Plaintiff is an African-American male over the age of forty. At the times pertinent to his complaint plaintiff was employed by the Federal Protective Service. Plaintiff alleges discrimination based on race, sex, age, color and reprisal, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., the Age Discrimination Act (ADEA), 29 U.S.C. § 623 et seq., the Equal Pay Act. (EPA), 29 U.S.C. §201 et seq**.**

Specifically, plaintiff alleges that the defendant discriminated and retaliated against him, when:

> Count 1. Defendant a) subjected him to "constant harassment, work conditions which were humiliating and by forcing him to retire before he was ready to retire" b) disapproved his leave request to accompany his wife to the hospital for emergency surgery; refused to accept plaintiff's leave slip, since 1995 never promoted plaintiff to Sergeant or paid for his work as a Sergeant; and gave a temporary promotion to a younger female corporal, in violation of Title VII. Complaint at at ¶7-8.

> Count 2. Defendant treated plaintiff in a manner that was different from younger employees, in violation of ADEA. *Id*. at ¶9-11.

Count 3. Defendant promoted a younger female employee to the grade of Sergeant and denied him equal pay, in violation of the EPA and Title VII. *Id.* at ¶12-15.

Count 4. Plaintiff was constructively retired from the Federal Protective Service on February 3, 2005 in violation of Title VII. *Id.* at ¶ 17-18, 26-27.

As set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff has failed to establish an essential element of his claims, there are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law. Alternatively, the defendant has legitimate non-discriminatory/retaliatory reasons for its actions. Wherefore, defendant respectfully requests that plaintiff's complaint be dismissed with prejudice as to all of his claims.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C. 20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                  )
GEORGE A. SHORT,           )
                                  )
     Plaintiff             )
                                  )
     v.                      )     Civil Action No.  05-01034  (RMU)
                                  )
MICHAEL CHERTOFF, SECRETARY )
UNITED STATES DEPARTMENT OF  )
HOMELAND SECURITY,      )
                                  )
     Defendant           )
                                  )
_____)

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF SUMMARY JUDGMENT MOTION

Defendant respectfully submits this memorandum of points and authorities in support of his summary judgment motion.

EEO COMPLAINTS

**Complaint 1:  Agency Case No. GSA-03-NCR-WPS-GAS-2**

On September 19, 2002,  plaintiff initiated an informal complaint with the Equal Employment Opportunity Office (EEO) of the General Services Administration (GSA).  ROI-2 at Ex 3A, EEO Initial Complaint Contact/Interview Worksheet.  Plaintiff's specific allegations, subsequently signed by plaintiff and dated October 8, 2002,  were as follows

> Corporal Short alleges discrimination for disparate treatment by Dean Hunter and harassment by Lieutenant Reginald Thomas, when he was
> 1. not selected for the Buffalo, N.Y. deployment assignment on September 18, 2002, against LT Thomas.  Background: he has been denied deployment for the past two years.
> 2. issued records of infractions on June 18, 2002 and July 18, 2002, against LT Thomas for:
>   a. failure to follow instructions
>   b. disrespectful behavior toward supervisor
>   c. absent without leave.
> 3. issued a notice of proposed action (suspension) from duty and pay for a period

not to exceed (30) days dated August 29, 2002, against Dean Hunter.
*Id.* at p. 2.  The basis of the alleged discrimination was race and age.  *Id.* at p. 1.   Plaintiff filed a formal complaint dated October 23, 2002 alleging discrimination on the basis of race, color, harassment and age, alleging the same facts.  ROI-2 Ex. 1,  Formal Complaint.

By letter dated October 28, 2002, plaintiff's claim pertaining to the Buffalo deployment was accepted but the remaining claims were dismissed for formal investigation.  The claims pertaining to the infractions issued June 18 and July 18 were dismissed as being untimely.  *Id.* at p. 3.  The allegation concerning the proposal to suspend was dismissed pursuant to 29 CFR, Part 1614.107.  *Id.* at p. 2-3.

By letter dated November 14, 2002, plaintiff's formal complaint was amended to add the claim that he was discriminated against because of his race, color and age when he was suspended from duty from October 22, 2002 to November 20, 2002.  ROI-2 at Ex 2A,  Nov. 14, 2002 ltr.

By letter dated February 27, 2003, plaintiff's complaint was amended to include the claim that he was "subjected to continuous retaliation and harassment from November 21, 2002, through January 1, 2003, 'regarding your weapon, work assignments, your vehicle, denial of leave, and missing supplies.'"  ROI-2 at Ex 2B, February 27, 2003 ltr.  This amendment was made pursuant to a  letter received from plaintiff on February 11, 2003.  *Id*. and attached letter date stamped received on February 11, 2003.

By letter dated June 24, 2003, the EEO accepted  plaintiff's May 28, 2003 request to amend his complaint by adding a claim that due to reprisal plaintiff was "subjected to harassment on April 30, 2003 [when] you were not contacted concerning a deployment of FPS officer to the Kentucky Derby."  ROI-2 at Ex 2C,  June 24, 2003 ltr at p. 2.

**Complaint 2: GSA Case No. 03-NCR-WPS-GAS-14**

On March 3, 2003, plaintiff made initial contact with the EEO Office concerning his

second complaint. ROI-14 at Ex. 2, EEO Counselor's Report. at p. 1. Plaintiff alleged discrimination on the basis of "age, sex and the Equal Pay Act when he was not promoted to the rank of sergeant nor paid at the sergeant's pay grade. He stated he believed age was the basis of the alleged discrimination because a younger similarly situated officer, Cassandra Talley, was temporarily promoted to the rank of sergeant, while he was not. He also alleged sex and Equal Pay Act discrimination because . . .Cassandra Talley, was temporarily promoted to the rank of sergeant and paid at that rank, while he has acted as sergeant since 1995, performed the same duties under similar working conditions, and management never paid him the sergeant's pay grade." *Id*. at p.2 ¶ D. Plaintiff sought "back pay from the day that Ms. Talley was made and paid sergeant's pay, compensatory damages" *Id.* at p 2-3 ¶*E*. By letter dated April 11, 2003, plaintiff filed a formal complaint of discrimination "seeking back pay from the day that Sgt. C. Tally was made and paid sergeant's pay, plus compensatory damages." ROI-14 at Ex.1, April 11, 2003 ltr. By letter dated April 17, 2003, the following claim was accepted for formal investigation

> Your claim that you were discriminated against when you learned on February 13, 2003, that Corporal Cassandra Talley was given a temporary promotion to sergeant, in which there was no announcement for the position and no selection process, therefore, you could not "bid" on the position, in which you have performed the duties of a sergeant since 1995, but have not been paid at the sergeant pay grade.

ROI-14 at Ex 3, April 17, 2003 ltr.

On February 14, 2005, a final agency decision was issued concerning the two complaints. Maltby Dec at ¶6.

**Constructive Discharge**

Plaintiff voluntarily retired effective February 25, 2005. Short SF-50 (retire). There is no record of any complaints filed by plaintiff from April 2003 to April 13, 2007. Maltby Dec at ¶7 and signature line. "Plaintiff did not file any complaints alleging involuntary retirement or

constructive discharge, with respect to his February 25, 2005 separation from federal service."
*Id.*

## STATEMENT OF FACTS

Plaintiff was employed by the Federal Protective Service as a Federal Police Officer.
ROI-2 at Ex. 1, Formal Complaint at p. 1. He was a Corporal (lead), Grade level GS-9. ROI-2
at Ex 5, Short May 1, 2003 Affidavit. In approximately March 2003, there was a mass transfer
of FPS officers from GSA into the Department of Homeland Security. See ROI-14 at Ex 8 at
form 50-B effective date 3-9-2003 and Ex. 2C at p. 1.

**Complaint 1[1]**

**Buffalo Deployment**

Plaintiff claimed that he was discriminated against "because of my race (Black), color
(fair skinned), and age (59 years - DOB: 4/1/43), when I [was] not selected by FPS Police
management for the Buffalo, New York deployment on September 18, 2002." ROI-2 at Ex 5,
Short May 1, 2003 aff. at p. 1.

During a management retreat outside of Washington, D.C., managers for the FPS
National Capital Region (NCR) were requested to send a detail of approximately 5 officers from
NCR to Buffalo as soon as possible. ROI-2 at Ex 6, Boyd aff. p. 1. Additional security was
needed at the Buffalo, N.Y. courthouse because of proceedings being held for suspected
terrorists. *Id.* Volunteers were needed who had valid government credit cards and could be
ready to leave immediately. *Id.* The volunteers had to provide their credit card numbers to the
Police Bureau administrative officer so that flight and lodging arrangements could be made

---

[1] The following statement of facts and description of plaintiff's factual allegations are based on
the EEO Reports of Investigation. In response to defendant's interrogatories seeking clarification
of plaintiff's allegations, plaintiff's counsel merely referred defendant to the Reports of
Investigation. See plaintiff's Responses to Defendant's Interrogatories and Document Requests.
Thus, for example, although plaintiff's complaint does not mention his 30 day suspension and
two deployments for which he was not selected, defendant has assumed that those facts and
others in the Reports of Investigation are a part of his complaint.

immediately.  *Id*. at p. 2.  Captain John Poston, who was in Washington, D.C.,  was contacted during the morning of September  17, 2002 and was told to get the volunteers.  *Id.*   By early afternoon the selections, airline and hotel reservations had been made.  *Id.*   Captain Poston was told to find anyone who could leave right away and that had a government credit card. Poston Dec at ¶ 3.  The goal was to have officers on a plane by 4:00 PM that day.  *Id*.  Captain Poston decided to canvass the day shift and contacted Lt. Holmes's squad.  *Id*. at ¶4-5.  There were six officers in Lt. Holmes's office when Poston called, and they all volunteered to be deployed to New York.  *Id.*    Five officers were selected from those six.  *Id.*  FPS was unable to get the officers on a flight that evening to New York, so the officers left the next morning.  *Id* at ¶6.

Captain Poston decided to canvass the day shift because they were at work and immediately available to respond to the request for volunteers. *Id* at ¶7; ROI-2 at Ex.6,  Boyd aff at p. 2.  Plaintiff and others assigned to the evening and midnight shifts were not asked to volunteer because enough volunteers had been found on the day shift.  *Id*; Poston Dec. at ¶7. Plaintiff's duty shift was 3 p.m.  to 11 p.m.  Short Depo at p.  73.  He was not on the day shift. Poston Dec. at ¶8.

**Kentucky Derby Deployment**

Plaintiff also submitted to EEO an affidavit which claimed that he had been subjected to reprisal on April 30, 2003, when he  was not contacted concerning the deployment to the Kentucky Derby.  ROI-2 at Ex. 5B, Short July 29, 2003 Affidavit.

Lt. Willie Sampson was contacted and told to select a team of nineteen officers for deployment to the Kentucky Derby.  ROI-2 at Ex.16, Sampson Aff. at p. 1.  As Lt. Sampson called officers, he was able to identify the nineteen officers before he got to the plaintiff's name. *Id.*   Lt. Sampson was aware that plaintiff had filed prior EEO complaints but he was not directly involved in the complaints. *Id.*

**Suspension from Duty from October 22, 2002 to November 20, 2002**

5

By letter dated  August 29, 2002 from FPS Deputy Director Dean Hunter, plaintiff was given notice of a proposal to suspend him for 30 days.   ROI-2 at Ex. 41, August 29, 2002 ltr. The letter was given to plaintiff on August 29, 2002,  by  Captain Webb Mitchell.   Mitchell Dec. at ¶ 2.[2]   The August 29, 2002 notice advised plaintiff:   ". . .we propose to suspend you from duty and pay for a period not to exceed (30) working days."  ROI-2 at Ex. 41 p. 1.  The notice advised plaintiff "From the date you receive this letter you will have 15 days to reply. Your answer may be made in person, or in writing or both.   You may submit affidavits in support of your answer, and an attorney or other representative may represent you."  *Id.* at p. 3. Plaintiff was given the address to which his reply should be mailed and also was given a telephone number to make an appointment should he wish to make an oral response.  *Id.*  He was maintained on active duty status until a final decision was made.  *Id.*

By letter dated October 15, 2002, plaintiff was advised by the Director of the Federal Protective Service that he was suspended from duty and pay from October 22, 2002 until Wednesday, November 20, 2002.  ROI-2 Ex. 27, Oct. 15, 2002 letter.  The letter advised

> Up to the date of this letter, you have not responded to the proposal [to suspend]. Therefore, we find that the reasons for taking this action are sustained.

*Id.*  The letter also advised plaintiff of his right to appeal to the Merit Systems Protection Board (MSPB) or to grieve the decision under the negotiated grievance procedures.  *Id.*  Plaintiff did neither.   Short Depo. at p. 93-94.  Plaintiff also did not attempt to get the Director to reconsider the October 15th 2002 decision letter.  *Id.*

---

[2]  On September 19, 2002,  plaintiff initiated an informal complaint with the Equal Employment Opportunity Office (EEO) of the General Services Administration (GSA) which included the allegation that he was
> 3.  issued a notice of proposed action (suspension) from duty and pay for a period not to exceed  thirty days dated August 29, 2002, against Dean Hunter.

ROI-2 at Ex. 3A, Initial Complaint Contact/Interview Worksheet at p.1 and *Id.* at p. 2 (same allegations with plaintiff's signature dated October 8, 2002).

The day after his suspension began, plaintiff sent a letter to Chief Boyd dated October 23, 2002, subject "Response to Charges and Notice of Proposed 30 days Suspension Against Me." ROI-2 at Ex 42, 10/23/02 ltr. This letter does not deny the charges specified in the notice of proposed suspension See *Id.*

**The Charges**

The notice of proposed suspension set forth three charges: 1. Failure to Follow Instructions; 2. Disrespectful Behavior Toward a Supervisor; 3. Absence Without Leave. ROI-2 at Ex. 41, 8/29/02 ltr. These charges stemmed from two Records of Infraction which had been issued plaintiff. ROI-2 at Ex. 33 & 34 (Short Depo at Ex. 7 & 8).

**Charge 1. Failure to Follow Instructions**.

In sum, the charge was that on Saturday June 8, 2002, plaintiff, who was assigned to work as an acting supervisory police officer, disobeyed orders of his supervisor to arrest a suspect in possession of a pistol and bring him to the South East Federal Center to be charged. Plaintiff disobeyed those instructions, released the suspect and returned the unregistered pistol to the suspect. ROI-2 at Ex. 33 p. 1-3. After plaintiff released the suspect, it was discovered that the suspect had several felony convictions. *Id.* at p. 8 ¶5,6 & p. 10, 11.

This failure to follow orders was the first offense specified in the first Record of Infraction. Id. at p. 3. Plaintiff made no comments concerning the Report of Infraction. *Id.* at p.1 box 2.

Plaintiff admits that he got a direct order from his supervisor to arrest the suspect. Short Depo at p.47-48, 147-148. Plaintiff admits that he disobeyed his supervisor's instruction to arrest the individual. *Id.* at p. 101-102.

**Charge 2   Disrespectful Behavior Toward a Supervisor**

Charge two, in the notice of proposed suspension and in the first infraction, pertains to what occurred later on June 8, 2002, back at the FPS office after the incident at the Ronald

Reagan Building.  Lt. Thomas, plaintiff's second line supervisor, talked with plaintiff about releasing the suspect and not following his orders to make the arrest.  ROI-2 at Ex 33 at p. 3. Plaintiff called Lt. Thomas a "dumb black nigger."  *Id.*; *Id* at Ex. 41, Aug. 29 2002 letter at p. 1-2;  *See also* Short Depo at Ex. 7, p. 3.  Plaintiff did not respond to the Record of Infraction. Short Depo at  p. 71.

Plaintiff admits that he called his supervisor "a dumb black nigger."  Short Depo at p. 102.

**Charge 3 Absent Without Leave (AWOL)**

Charge three relates to plaintiff being away without leave on July 3, 2002 through July 5, 2002:  "for a total of 24 hours, you were absent without authority or adequate justification from your required duty station."  ROI-2 at Ex. 41 p. 2-3.  The charge relates the following.  Plaintiff's request for annual leave for July 4, 2002 had been denied by Lt. Thomas on June 19, 2002. Plaintiff's request for annual leave on June 29, 2002 also had been denied.  *Id.*  Although plaintiff's leave requests had been denied, plaintiff was overheard stating that he would not be coming to work on June 29, 2002 or July 4, 2002.   *Id.* at p.  3 & Ex. 36.

On June 19, 2002, the Assistant Chief had issued a memorandum advising the FPS officers of an expected demonstration on June 29, 2002 and of  possible terrorist activity in Washington, D.C. on July 4, 2002.  ROI-2 at Ex. 35.  On July 4, no officers on plaintiff's shift were to be excused from duty except those with previously scheduled leave.  *Id.*

On June 29, 2002, plaintiff did not report for duty as scheduled and at approximately 4:20 called in a request for leave for an emergency.  The request was denied and plaintiff was listed AWOL.  ROI-2 at Ex 34 p.1-2; 6.  Plaintiff stated that his wife was ill, and Lt Thomas told him to bring in medical documentation.  ROI-2 at Ex. 42.  On July 3, 2002, plaintiff called in and stated that he was ill.  ROI-2 at Ex. 34 p. 2**.**     He was away from work from July 3-July 6. *Id.*  Plaintiff submitted a disability certificate dated July 3, 2002.  Ex 34 at p. 12   Plaintiff was

placed on AWOL because the certificate was not acceptable.  ROI-2 at Ex.41 p. 2-3. First, it did not include a description of the medical condition that allegedly caused plaintiff to be incapacitated.   Second, the certificate bore inconsistent information:  the certificate, dated July 3, 2002, stated plaintiff was totally incapacitated from July 3-July 8, 2002; although the certificate stated plaintiff was incapacitated until July 8, plaintiff returned to work on July 6, and worked not only his regular shift but also  overtime; in addition, the doctor had checked "sufficiently recovered [as of July 3, 2002]  to resume a normal work load."  *Id.*

When presented with the Record of Infraction, plaintiff chose not to make a statement. *Id.* at p. 3 and ROI-2 at Ex. 34 box 2.

**Alleged  Continuous Retaliation and Harassment from November 21, 2002, Through January 1, 2003, Regarding Weapon, Work Assignments, Vehicle, Denial of Leave, and Missing Supplies.**

Plaintiff's suspension ended on November 20, 2002 and he returned to work on November 21, 2002.  He claims that he was retaliated against and harassed after filing a complaint with the EEO due to the incidents summarized below:

1.  November 21, 2002,  his pistol had not been returned from the pistol range, was not in the safe, and he worked in the office.

2.  November 22, 2002, he was issued his weapon; he had to use a spare vehicle (not the one previously issued to him) without his equipment and supplies.

3.   November 26, 2002, plaintiff was assigned vehicle # 981, but  he did not drive it home "because of no paper work and improper procedure."

4.  November 27, 2002, he signed for vehicle #981 but it was a 2000 model and his old vehicle was a 2002 model.  His equipment and supplies were still missing.

5.  November 28, 2002, he was denied leave for Thanksgiving Day by Lt. Thomas.

6.  December 3, 2002, plaintiff was given his equipment and supplies by Demiko Suggs, but plaintiff found that two computer speakers, a power inverter and vehicle cleaning supplies

were missing.

     7.   December 4, 2002, the remaining supplies were still missing.

     8.   December 5, 2002, FPO Parry gave him a box with all the missing supplies.

     9.   December 18, 2002, he learned that Lt. Thomas denied his request for leave for December 25 but approved his request for December 24, and plaintiff chose not to take the approved leave.

     10.   December 28, 2002, plaintiff learned that his leave request for January 1, 2003 was denied, but that his request for December 31, 2002 was approved.

*See* Short Depo. at Ex. 4.

**COMPLAINT 2: Temporary Promotion to Sergeant**

     FPS Lt. Maybelle Hallman was designated to be the deputy commander of a newly established Homeland Security unit.  ROI-14 at Ex.5C, Hallman aff at ¶1.  In approximately January 2003, Lt. Hallman was asked by Patrick Moses, the Acting Deputy Regional Director, to select officers to be members of the new Homeland Security unit. *Id*. at ¶2.  She was told to pick good people who did not have disciplinary problems.  *Id*.  Lt. Hallman went through the Navy Yard roster, and relying on her personal experience with the officers and their general reputation, she chose the officers she thought were best suited for the detail.  *Id*.  One of the individuals she chose was Lead Police Officer Cassandra Talley. *Id*.  After Cpl. Talley went on the detail, she received a temporary promotion to sergeant from upper management.  *Id*.

     Effective February 23, 2003, Officer Talley received a 120 day temporary promotion to the position Supervisory Police Officer.  ROI-14 at  Ex 9,  Forms 50 effective date 2-23-03 & 3-09-03 (Promotion NTE 22-Jun-2003).  The temporary promotion raised Ms. Talley's total yearly salary to $61, 443 for the 120 day period.   ROI-14 Ex 9.

     At this time plaintiff's official title was Lead Police Officer, and his grade level was GS-9.  ROI-14 at Ex 8.    A lead police officer "assists the Team supervisor and fills in on  a

temporary basis during the supervisor's absences.  ROI-14 at Ex. 6 p. 1.  Plaintiff's duties as a lead police officer included the duty to "act[] in the stead of the Supervisor when the Supervisor is not available." ROI-14 at  Ex. 6 at p. 3.    Effective January 12, 2003, plaintiff's total yearly salary was $64, 832.  ROI-14 at Ex 8, Forms 50 effective date 1-12-2003 & 3-9-03.

## ARGUMENT

### A.  Summary Judgment

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  A genuine issue is one that could change the outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn there from must be considered in the light most favorable to the nonmoving party, *see, Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), a complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).   In determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the non-moving party.  *Matsushita,* 475 U.S. at 587.  "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'"  *Celotex Corp*., 477 U.S. at 323 (citations omitted).

### B.  Failure to Exhaust Administrative Remedies

The Supreme Court has held that Title VII creates an exclusive and preemptive structure for federal employment discrimination cases at both the administrative and judicial level.  *Brown v. General Services Administration*, 425 U.S. 820, 829-33 (1976).  Because conciliation and

internal agency resolution, rather than litigation, are the objectives of Title VII, exhaustion of statutory administrative remedies is a prerequisite to judicial relief. In order to pursue a cause of action in federal court for employment discrimination under Title VII, a plaintiff is required to exhaust his administrative remedies. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002); *Bayer v. U.S. Dept. of Treasury*, 956 F.2d 330, 332 (D.C.Cir.1992). To properly raise a claim under Title VII, a federal employee must contact an EEO counselor within 45 days of the plaintiff's notification of the allegedly discriminatory event. *Park v. Howard University*, 71 F.3d 904, 907 (D.C.Cir.1995); 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.105(a)(1).[3] This 45-day time limit is not jurisdictional, but operates as a statute of limitations defense. *Zipes v. Trans World Airlines, Inc*., 455 U.S. 385, 393(1982); *Armstrong v. Reno*, 172 F Supp. 2d 11, 20 (D.D.C. 2001) *See also Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (filing period begins at time of alleged discrimination, not when its effects are later felt).

Plaintiff has failed to exhaust his administrative remedies concerning his constructive discharge claim, because plaintiff never contacted the EEO concerning constructive discharge. *See* Judy Maltby Dec. There is no record of any complaints filed by plaintiff from April 2003 to April 13, 2007. *Id.* at ¶7 and signature line. "Plaintiff did not file any complaints alleging involuntary retirement or constructive discharge, with respect to his February 25, 2005 separation from federal service." *Id.*

For plaintiff's second EEO complaint alleging discrimination due to the temporary promotion of Cassandra Talley, initial contact with the EEO was on March 3, 2003. ROI-14 at Ex. 2. To the extent plaintiff's complaint can be construed as a more general allegation of discrimination for failure to promote him or to pay him at the pay level of a sergeant dating back

---

[3] For an age discrimination claim a plaintiff alternatively may file directly in federal district court in the first instance if 1) the employee gives the EEOC not less than 30 days' notice of intent to file such an action, and 2) such notice is filed within 180 days after the alleged unlawful act occurred. *See Thorne v. Cavazos*, 744 F.Supp. 348, 350 (D.D.C. 1990).

to 1995, any such allegations dating before January 17, 2003 are barred.[4]

February 11, 2003 was plaintiff's initial contact concerning his allegation of retaliation and harassment from November 21, 2002 through January 1, 2003. ROI-2 at Ex. 2B p. 2-4. Forty-five days before February 11, 2003 is December 28, 2002.    Therefore 9 of plaintiff's 10 discrete claims of retaliation – items 1-9 dating November 21 to December 27, 2002 --are barred.

### C. Discrimination Claims

Defendant has not submitted any direct evidence of discrimination. In the absence of direct evidence, a district court may rely on the *McDonald Douglas* procedure to evaluate the plaintiff's case and determine if trial is necessary. Under the procedure first set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of prohibited discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993). *MacDonnell- Douglas* articulated the requirement that a plaintiff establish a prima facie case as the initial step in the burden of production, because the prima facie case includes the minimal essential elements required to raise an inference of discrimination. Therefore, "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 323 (citations omitted).

If the employee succeeds in establishing a prima facie case, the employer then must articulate legitimate, nondiscriminatory reasons for its actions. *See McDonnell Douglas*, 411 U.S. at 802. The defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259-260 (1981). The plaintiff then has an opportunity to discredit the employer's explanation or

---

[4] Plaintiff alleged that he applied for a promotion to Sergeant two times. The second time was in the late 90's. *See* Short Deposition at p. 111-112. He did not file discrimination claims concerning those non-selections. *Id.*

otherwise demonstrate that discrimination was a motivating factor. *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288-89 (D.C. Cir. 1998). The plaintiff at all times retains the burden of persuasion. *McDonnell Douglas*, 411 U.S. at 802; *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 143 (2002).

The Supreme Court has explained that the elements of a prima facie case of discrimination may differ from case to case. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981). The fundamental requirement, however, is that the prima facie case give rise to an inference that the defendant's conduct was discriminatory. *See Simens v. Reno*, 960 F.Supp 6, 8-9 (D.D.C. 1997). As a general matter, therefore, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) he was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)(Title VII), *Aka*, 156 F.3d at 1288.

A plaintiff must present substantial and credible evidence of discrimination in order to survive a motion for summary judgment. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); *Hastie v. Henderson,* 121 F.Supp.2d 72, 77 (D.D.C. 2000) *aff'd*, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); *Woodruff v. DiMario*, 164 F.Supp. 2d 1, 5 (D.D.C. 2001). Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Weigert v. Georgetown University*, 120 F.Supp. 2d 1, 22 (D.D.C. 2000),

14

*quoting, Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (2000).

### D. Retaliation Claim

A prima facie case alleging retaliation or reprisal is established when the plaintiff demonstrates: (1) that he engaged in protected behavior, (2) defendant subjected him to a materially adverse action, and (3) that a causal connection existed between the protected activity and the materially adverse action. *See E.E.O.C. v. Go Daddy Software,* 2006 WL 1791295, *6 (D.Ariz 2006); *Argo v. Blue Cross and Blue Shield of Kansas, Inc,.* 452 F.3d 1193, 1202 (10th Cir 2006); *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415 (2006); *Rochon v. Gonzalez*, 438 F. 3d 1211, 1219 (D.C.Cir. 2006); *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). In defining a materially adverse action, the Supreme Court has ruled that

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' "

*Burlington,* 126 S.Ct. at 2415 (citations omitted).

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows **that for a discrimination claim, i.e. the employer then must articulate legitimate,** nondiscriminatory reasons for its actions. The plaintiff then has an opportunity to discredit the employer's explanation or otherwise demonstrate that retaliation was a motivating factor.

In order to establish a prima facie case of retaliation, a complainant also must show a casual connection existed between the materially adverse action and his statutorily protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984). The casual connection required to establish a prima facie case of retaliation may be shown by evidence that the agency had knowledge of the protected activity and that there was a temporal link between the activity and the adverse personnel action. *Jones v. Washington Metropolitan Area Transit Authority*, 946 F. Supp. 1011, 1021 (D.D.C. 1996). "The cases that accept mere temporal proximity between an agency's knowledge of the protected

15

activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case, uniformly hold that temporal proximity must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273-274 (2001), *citing Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)(three month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(four month period insufficient); *Mayers v. Laborers' Health & Safety Fund of North America,* 478 F.3d 364, 369,(C.A.D.C. 2007).

### E.  Nature of Agency Action: adverse personnel action or a materially adverse action

**Discrimination Claims–Adverse Personnel Action**

In discrimination claims against federal employers a required element is some form of legally cognizable adverse personnel action by the employer.  *Brown v. Brody*, 199 F.3d 446, 453 (D.C.Cir. 1999); *Weigert v. Georgetown University*, 120 F.Supp.2d 1, 17-18 (D.D.C. 2000 ).

To establish an "adverse personnel action" there must be a significant change in the complainant's employment status--such as failing to hire, firing, failing to promote, or a decision causing a significant change in benefits.  *Id*.

Courts have further defined the concept of an "adverse personnel action" as one involving a **material** change in the aggrieved employee's employment status.  A materially adverse change can be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.  *Crady v. Liberty Nat. Bank & Trust Co. of Ind.*, 993 F. 2d 132, 136 (7th Cir. 1993)*; compare with Flaherty v. Gas Research Institute* (7th Cir. 1994)(a "bruised ego" is not enough), *Koscis v. Multi-Care Mgt., Inc.,* 97 F. 3d 876, 887 (6th Cir. 1996)(demotion without change in pay, benefits, duties, or prestige insufficient), *Harlston v. McDonnell Douglas Corp.,* 37 F. 3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

**Retaliation Claims-Materially Adverse Action**

In explaining the retaliation standard of "materially adverse" actions, the Supreme Court

has stated that

> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace.". . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington*, 126 S. Ct. at 2415 (citations omitted). The Court also stated that the standard is to be

objective.

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

*Burlington*, 126 S.Ct at 2415 (Citations omitted).

**Age discrimination claims**

In order to establish a prima facie case of discrimination under the ADEA plaintiff must

establish that he was disadvantaged in favor of a similarly situated substantially younger person.

*See, e.g. Wade v. Lerner New York, Inc.*, 243 F.3d 319 (7th Cir. 2001):

> For Wade to make out a prima facie case for the discriminatory denial of a promotion under the ADEA she must show that: (1) she was a member of the protected class of persons forty or older; (2) she applied and was qualified to be an assistant manager; (3) she was not promoted; and (4) similarly situated younger employees were treated more favorably. *See Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir.1996).

*Wade*, 243 F.3d at 323-324; *Breen v. Mineta*, 2002 WL 3276163, *3 -4 (D.D.C.2005)

("Plaintiffs do not appear likely to be able to show that the FAA acted with discriminatory intent.

First, they have not identified any other comparable group that was substantially younger and was

treated more favorably.")

17

**Equal Pay Act (EPA)**

To establish a violation of the Equal Pay Act, a plaintiff must demonstrate that "the employer paid male and female employees different wage rates for substantially equal work." *Turner v. District of Columbia,* 383 F.Supp.2d 157, 179 (D.D.C.2005)(*citing to Broadus v. O.K. Industries, Inc*., 226 F.3d 937, 941 (8th Cir.2000)).

The statute of limitations for an EPA claim is two years. Title 29 U.S.C.A. § 255 provides that

> Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], . . . .--
>
> (a) if the cause of action accrues on or after May 14, 1947--may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C.A. § 255. The plaintiff filed his complaint on May 20, 2005. Therefore, the statute of limitations bars any claim under the EPA before May 20, 2003, or before May 20, 2002 for a willful violation.

Plaintiff bears the burden of proving willfulness. *Wyland v. District of Columbia Government*, 728 F.Supp. 35, 37 (D.D.C.1990).

> A defendant's violation of the Equal Pay Act is willful or reckless within the meaning of § 255(a) if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). *See also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

*Hawley v. Blackboard, Inc*., 2005 WL 513496, *11(D.D.C.2005). In the instant matter the plaintiff has offered no evidence that the defendant engaged in a willful violation of the Equal

Pay Act.  Therefore, the two year statute of limitations is applicable to his allegations.[5]

## ANALYSIS OF PLAINTIFF'S CLAIMS

### NON-SELECTION FOR BUFFALO DEPLOYMENT

#### Prima Facie Case

Plaintiff claimed that he was discriminated against on the basis of age when he was not

selected for the Buffalo N.Y. deployment on September 18, 2002.

> I do not know who made the decision as to who would be deployed to Buffalo,
> New York on September 18, 2002.  I do recall who was selected to go on this
> deployment.  I know they were all younger than I was. I don't know what the
> process that was used to make the selections for this deployment.   It is my
> allegation that if it were not for my age I would have been selected for the subject
> deployment."

ROI-2 at Ex 5 p. 1-2.

Plaintiff has offered no direct evidence of discrimination on any basis, i.e.  age, sex, race

or retaliation. Plaintiff also has failed to establish a prima facie case pursuant to *McDonnell*

*Douglas.*   Plaintiff has failed to establish an essential element of his claim.  He has failed to

show that he was similarly situated to the alleged comparators  – the allegedly younger

individuals who were deployed to Buffalo.  *See Wade*, 243 F.3d at 323-324;  *Mungin v. Katten*

*Muchin & Zavis*, 116 F.3d 1549, 1554 (D.C.Cir.1997) ("Mungin never carried his burden of

explaining how the firm's actual decision in his case was based on race. Not 'all of the relevant

aspects of' his 'employment situation were 'nearly identical' to those' of the associates to whom

he compared himself.");  *Johnson v. Dong Moon Joo,*  2006 WL 627154, *23

(D.D.C.2006)("Plaintiff's disparate treatment salary claim wilts on the prima facie vine due to her

inability to meet the third prong of the relevant test--the 'similarly situated' requirement. With

---

[5]  In his Opposition to defendant's motion for partial dismissal, the plaintiff advised the Court
that his claim under the EPA is valued less than $10,000, and thus remains within the jurisdiction
of this Court.  Docket #12 at p. 3.   The motion to dismiss currently is pending before the Court.

respect to this prong, Plaintiff must identify an employee outside her class who was similarly situated to her, but afforded more favorable treatment. *See Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C.Cir.1995). Plaintiff is unable to meet this requirement.")

As is discussed in more detail below, all of the individuals who were deployed were on the day shift and at work when the urgent request for volunteers was made. Plaintiff was on another shift and was not at work when the request for volunteers was made. No other officers not on the day shift were deployed.

### Not Similarly Situated/ Legitimate Non-discriminatory Reason for Non-selection

On September 17, 2002 Captain John Poston (Black, DOB: 11/22/47) was informed that there was an emergency need to identify five volunteers to be temporarily dispatched to Buffalo, N.Y. Poston Dec.at ¶2. Additional security was needed at the Buffalo, N.Y. courthouse because of proceedings being held for suspected terrorists. *Id.* Captain Poston was told to find anyone who could leave right away and that had a government credit card. The goal was to have officers on a plane by 4:00 PM that day. *Id.* at ¶3. Captain Poston decided to canvass the day shift and called Lt. Holmes's squad. *Id* at ¶5. There were six officers in the office when Poston called, and they all volunteered to be deployed to New York. *Id.* Five officers were selected from those six. *Id.* FPS was unable to get the officers on a flight that evening to New York, so the officers left the next morning. *Id.* at ¶6.

All of the volunteers were taken from the day shift, because the day shift was on duty and immediately available to respond to the request for volunteers. *Id at ¶7*; ROI-2 at Ex. 6, Boyd aff. at p. 2. Plaintiff and others assigned to the evening and midnight shifts were not asked to volunteer because enough volunteers had been found on the day shift. *Id.* Plaintiff's duty shift was 3 p.m. to 11 p.m. Short Depo at p. 73. Thus, plaintiff was not similarly situated to the officers who were deployed to Buffalo.

The volunteers sent to Buffalo consisted of three blacks and two whites. Two were aged

39, two were 44, and one was 39.   ROI-2 at Ex. 20, List of Employees for Buffalo.

"Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.... Thus, the ADEA commands that employers are to evaluate older workers on their merits and not their age. The employer cannot rely on age as a proxy for an employee's characteristics, such as productivity, but must instead focus on those factors directly."   *Breen v. Mineta*, 2005 WL 3276163, *3 -4  (D.D.C.2005).  Here, the acts of the defendant do not reflect that defendant was making employment decisions concerning plaintiff on the basis of inaccurate and stigmatizing stereotypes concerning his age, or due to his race, color or sex.  Rather the defendant made a business decision to select for deployment the volunteers who were immediately available, hoping to get them on a plane by 4pm that day.  That is defendant's legitimate non-discriminatory reason for its actions.

Plaintiff has failed to meet his burden of showing any discriminatory animus or motive in the decision to select for deployment volunteers immediately available when the request came in. This is just the type of personnel decision this Circuit has cautioned against second guessing "absent demonstrably discriminatory motive."  *See Mungin v. Katten Muchin & Zavis*,  116 F.3d 1549, 1556-1557 (D.C.Cir.1997).

### New Retaliation Allegation

At his deposition in July 2007,  plaintiff presented a new allegation not reported in the ROI nor in his responses to defendant's interrogatories.  *See generally* ROI-2 at Ex. 5 and plaintiff's Interrogatory Responses.  He alleged that his nonselection for the Buffalo deployment and other alleged actions were acts of retaliation due his having made a complaint in 2001 to his supervisor that Lt. Thomas had "sexually harassed" him.  *See* Short Depo. at p. 22-28.  This complaint allegedly was made orally to Captain Mitchell in 2001.  *Id*. at p. 26.  Plaintiff admits that he filed no complaint concerning this alleged harassment with the agency EEO office.  *Id*. at

p. 28.

Plaintiff has offered no evidence that Lt. Thomas had any knowledge of this alleged complaint, and Captain Mitchell did not tell Lt. Thomas about any such complaint. *See* Mitchell Dec. at ¶3. Further, even assuming hypothetically that Lt. Thomas had been informed of such a complaint in 2001, plaintiff cannot establish a causal connection to any of the employment actions alleged in plaintiff's complaints, since none of the alleged acts occurred in close temporal proximity to the alleged complaint in 2001. For example, the infractions were issued in June/July 2002 -- at least 6 months after the end of 2001; the Buffalo deployment was in Sept. 2002 and the decision on who was deployed was not made by Lt. Thomas; the decision to suspend plaintiff was made in October 2002 by the Director; the denials of holiday leave complained about were in November and December 2002 -- at least 11 months after the end of 2001. Thus, plaintiff would not have been able to establish a causal connection based on close temporal proximity between the alleged protected act and the acts of alleged retaliation.

**RECORDS OF INFRACTION AND NOTICE OF PROPOSED SUSPENSION**

**Prima facie case**

On about June 26 and July 18, 2002, plaintiff was issued Records of Infraction by Lt. Thomas. ROI-2 at Ex. 33, 34. On August 29, 2002, plaintiff was issued a notice of proposed suspension ("notice"). *Id.* at Ex. 41. Plaintiff has failed to establish a prima facie case of discrimination or retaliation because he has not shown a material adverse action or a material adverse employment action. The records of infraction and notice of proposal to suspend did not change plaintiff's pay, grade or benefits. Plaintiff retained his pay and duty status until a final determination was made on the proposal to suspend. *Id.* at p. 3. *See Brown v. Brody*, 199 F.3d 446, 458 (D.C.Cir.1999) (letter of admonishment did not constitute an adverse personnel action because it affected neither the appellant's grade nor his salary.); *Walker v. WMATA*, 102 F.Supp. 2d 24, 29 (D.D.C. 2000), *citing Johnson v. Danzig*, 2000 U.S. App. LEXIS 7517, 2000 WL

45887, *2 (4th Cir. 2000) (letter of reprimand is not an adverse personnel action).   Similarly, the records of infraction and notice of proposed suspension, which imposed no objective harm, are not material adverse actions for purposes of a retaliation claim.

**THIRTY DAY SUSPENSION**

 **Prima facie Case**

  Defendant assumes for purposes of this motion that plaintiff can establish a prima facie case of discrimination based on race since plaintiff falls within a protected group and the suspension had a material adverse effect since he was in a non-pay status.

  However, plaintiff has failed to establish a prima facie case of age discrimination since he has not established that he was disadvantaged in favor of a similarly situated "substantially younger" person, or other indicia of age discrimination.   For example:

- Plaintiff has not presented evidence showing that he was similarly situated to the other FPS officers on the scene.  Unlike the other officers, plaintiff was the acting FPS supervisory officer on the scene at the Reagan Building and it was he who received and disobeyed direct orders to arrest the suspect.  The other FPS officers on the scene were subordinate to plaintiff.  Short Depo. at p. 147-148.  See also ROI-2 at Ex. 14 , Smith Aff. ("I did not agree with the decision made by the complainant to release the suspect but he was the senior officer and the supervisor on the scene.")

- Plaintiff  has not presented evidence of any younger individual who made such an abusive and offensive statement to Lt. Thomas and was not disciplined.

- Plaintiff  has not presented evidence of any other individual who, after being denied leave,  stated that he none-the-less was not coming in to work;  who then failed to come to work on those days,  and who then presented a questionable certificate of disability.

Thus, plaintiff has failed to establish an essential element of his age discrimination claim.

 **Disciplinary Procedures**

The GSA Disciplinary Desk Guide (Disciplinary Guide)  summarizes the disciplinary process then applicable to FPS employees.  ROI-2 at Ex 22.   A form called "Record of Infraction" could be used by supervisors to initially record violations under the GSA Penalty Guide.  *Id*. at p. 3.   In block 1, the supervisor is to state the facts.   After the supervisor has completed, signed and dated block 1, the employee may make any statement or comment he wishes to make in block 2.  *Id.*    In block 4, a proposed action is to be recommended.  If an adverse action is proposed, a notice of proposed adverse action is to be issued to the employee.  *Id.* at p.  6.   The notice is to include the reason for the proposed action,  advise that the employee may answer orally or in writing and may furnish affidavits and other documentary evidence, advise that the employee may be represented.  After receipt of the employees' reply, or after the time for the reply has expired, a final recommendation is made concerning what action should be taken.  *Id*.  A notice of final decision on adverse action is then issued.

The Penalty Guide pertaining to discipline provides, in pertinent part, for the following penalties:

| Type of Misconduct | 1st Offense | 2nd Offense |
| --- | --- | --- |
| 5. absent from duty for one day or less without permission and without adequate justification. . . . | Warning notice | Reprimand to Suspension |
| 6. Absence from duty for more than one day without permission and without adequate justification . . . . | Warning notice to reprimand | Reprimand to Removal |
| 7. Misuse of sick leave. . . . | Warning notice to removal | Reprimand to removal |
| 8. Insubordination; deliberate refusal to comply with authorized instructions issued by a supervisor, disrespect, insolence, and like behavior | Reprimand to removal | Suspension to removal |
| 10. Disorderly conduct. | | |
| a. Use of abusive or offensive language. . . . | Warning notice to suspension | Reprimand to removal |

*Id.* at p. 8 et seq., Penalty Guide Table I , Parts1 &2.

"[W]hen two or more offenses are being considered for disciplinary action at the same time, a greater penalty than would be imposed for a first offense may be appropriate."  *Id* at  Ex. 24, AFGE Union Agreement at p.  70, Section 3. C. & see *Id* at Ex. 23, GSA Standards of Conduct , Part 8 Maintaining Discipline at p. 119.

The deciding official for a suspension is any official at the division director or higher level.  *Id* at Ex 23 p. 113-114.

**Legitimate Non-discriminatory Reason**

Plaintiff's first Record of Infraction was completed by Lt. Thomas on June 26, 2002. ROI-2 at  Ex 33 (Short Depo. Ex. 7) at p. 1.  The infractions described were plaintiff's failure to obey the order to arrest and his offensive language to his supervisor on June 8, 2002 , which resulted in the following charges

1.  Deliberate refusal to comply with authorized instructions issued by a

25

supervisor, disrespect, insolent and like behavior.

2.  Disorderly conduct; use of abusive or offensive language

3.   Neglect of duty – failure to carry out instructions where safety of person or property is endangered.

*Id* at p. 3.  Plaintiff signed block 2 of the Record of Infraction but made no statement.  *Id.* at p. 1.

Lt. Thomas recommended that plaintiff be suspended for 30 days.  *Id.* at block 4.  That

recommendation was concurred with by Captain Mitchell.  *Id*. at block 5

Plaintiff's second record of infraction was issued by Lt. Thomas on July 15, 2002. ROI

Ex. 34.  Plaintiff was charged with being absent without authority on June 29, 2002 and from

July 3 until July 5, 2002.  *Id.* at Ex 34 at p. 2.  Block 2 was signed by plaintiff on July 18, 2002,

but he made no statement.  *Id.*  at p. 1 block 2.  Lt. Thomas recommended a 5-days suspension.

*Id.* at block 4.  Captain Mitchell concurred with the recommendation.

In a memorandum dated August 9, 2002, Don Walton, the Assistant Chief of Police

found the proposed penalty to be appropriate and within the guidelines.  He also found no

mitigating circumstances.   *Id* at  Ex 33 at p.6.

On August 29, 2002, plaintiff was given a notice of proposed suspension, signed by

Deputy Director Dean S.  Hunter, which set forth the charges and advised plaintiff of his right to

respond either orally or in writing, to submit affidavits or documents and to be represented. *Id. at*

 Ex. 41.   Deputy Director Hunter advised

in proposing a 30-day suspension, I considered as aggravating factors your position as a Lead Police Officer and Acting Supervisor, and the seriousness of your offenses. As a Lead Police Officer you are expected to set the example for your subordinates, follow the directions you are given, and enforce laws and regulations. Releasing a suspect who has violated D.C. law and may present a danger to persons or property, despite your supervisor's repeated instructions to the contrary, is a serious offense. Calling your supervisor derogatory, offensive names in the presence of a subordinate officer is intolerable. Being AWOL on July 4th when all police officers were needed to work in order to respond to potential terrorist threats is unacceptable.

*Id.* at p. 3.  Plaintiff was given 15 days to reply to the August 29th Notice, and was told to make

his reply to the Director of the Federal Protective Service.[6]  *Id.*

Plaintiff made no reply to the Director, and by letter dated  October 15, 2002, the Director advised plaintiff

> This refers to our previous letter to you dated August 29, 2002, in which you were informed that we proposed to suspend you from duty and pay for a period not to exceed 30 days.

> Up to the date of this letter, you have not responded to the proposal.  Therefore, we find that the reasons for taking this action, as set forth in our previous letter are sustained.  You are hereby advised that you will be suspended from duty and pay from Tuesday, October 22, 2002 until Wednesday, November 20, 2002.  You are to return for duty on Thursday, November 21, 2002.

ROI Ex 27. [7]

Thus, the legitimate non-discriminatory reason for defendant's actions, is that, as is reflected in his letter,  the Director suspended plaintiff based on the information submitted to him concerning the Records of Infraction.  The misconduct reported up the chain of command was not refuted by plaintiff at the Record of Infraction stage nor in any reply to the Director to the Notice of proposed suspension, since plaintiff failed to reply to the Notice.   The misconduct described clearly fit within the misconduct reflected in the penalty chart.  Further, comparison of the charged conduct to the table of penalties shows that the penalty imposed was well within the proper exercise of the Director's authority.  Finally, plaintiff does not deny his absence on July 3-5, and he admits the most serious of the charges, failing to obey the direct order of his supervisor to arrest a suspect in possession of a firearm and using abusive and offensive language towards

---

[6]  On September 19, 2002 plaintiff visited the EEO office and made three allegations of discrimination:   1, concerning the Buffalo deployment; 2, concerning the notices of infraction, and 4 concerning "issued a notice of proposed action (suspension) from duty and pay for a period not to exceed thirty days (30) dated August 29,2002, against Dean Hunter."  ROI -2 at Ex 3, Initial Contact worksheet.   Plaintiff signed a typewritten statement of the same allegations on October 8, 2002.  *Id* at p.  2.

[7]  The only response to management made by plaintiff was a letter dated October 23, 2002,made after the Director suspended plaintiff, which plaintiff submitted to Chief Boyd.  ROI-2 at Ex 42. This letter also did not deny that plaintiff failed to follow orders and used offensive language to his supervisor.

his supervisor.

**AWOL**

Count 1 of plaintiff's District Court Complaint alleges discrimination when "Defendant .

. .b) disapproved his leave request to accompany his wife to the hospital for emergency surgery;

refused to accept plaintiff's leave slip . .. ."Complaint at  at ¶7-8.   Defendant construes this to

pertain to the instances when plaintiff was placed on AWOL for  June 29, 2002 and  July 4,

2002.

As is indicated above, on June 19, 2002, a memorandum of cancellation of Day Off

pertaining to June 29 and July 4, 2002 had been issued to the FPS Officers.  ROI-2 at  at Ex 35.

Plaintiff had submitted a leave slip for July 4, 2002, which was denied on June 19, 2002.  *Id.*  at

Ex 34 C.  On June 28, 2002, plaintiff had submitted to Sgt. Sherrod a leave slip for June 29,

2002, which was denied.   ROI-2 at Ex 34 and 34A.  Captain Simms reported  to Lt. Thomas a

June 28, 2002 conversation with plaintiff and Sgt. Sherrod about leave for June 29, 2002:

> I interrupted the conversation to let them know that no leave could be granted
> because of the demonstration that was planned for the next day June 29, 2002.
> Also if an officer or supervisor did not already have leave scheduled for June 29
> or July 4 no leave would be granted, and they could not be excused on those dates.
>  Sgt. B. Sherrod said that was right he had forgotten about the memo from the
> assistant chief.  As Cpl. Short left the office he stated that he would not be in.  I
> told him as a leader, he shouldn't make that kind of statement.

*Id.* at Ex. 36 & 13.

On June 29, 2002,   plaintiff called in a report of absence and requested emergency annual

leave. He spoke with Lt. Thomas.  The request was denied.  *Id.* at Ex. 34 p.  1-2, 6.  Plaintiff did

not report for duty until July 2, 2002.  On July 3, plaintiff called in ill and was out through July 5,

2002.  *Id.* at  p. 2.  On July 3, 2002, Lt.  Thomas received information from  Capt. Simms about

plaintiff's conversation with Sgt. Sherrod in which plaintiff stated that he was not going to report

for duty on June 29 and July 4, 2002.  *Id.* at p. 2.   On July 18, 2002, plaintiff received a notice of

infraction advising that he was being charged with  being absent without authority for those days.

*Id.*

Initial contact in this case was made on September 19, 2002. ROI-2 at Ex 3A. Forty-five days before September 19 is August 15, 2002. Since plaintiff received his notice of infraction on July 18, 2002, plaintiff's contact with the EEO counselor concerning the AWOL charges was untimely, and his claims of age, race, sex and retaliation discrimination are barred.

To the extent plaintiff alleges age discrimination, plaintiff failed to identify or offer evidence of any significantly younger individual who was similarly situated to him, and was given leave and was not placed on AWOL. Therefore, plaintiff has failed to establish an essential element of a claim of age discrimination concerning being placed on AWOL.

Additionally, the legitimate non-discriminatory reasons for Lt. Thomas placing plaintiff on AWOL are the same as for his suspension. Plaintiff had been denied leave for June 29. Plaintiff called in on June 29 requesting emergency leave. Lt. Thomas denied the emergency leave and plaintiff did not report to work. Plaintiff therefore was placed on AWOL and he was given instructions to bring in a doctor's slip.[8] Lt. Thomas learned on July 3 that plaintiff had stated that he would not be in on June 29 and July 4 even though he had been denied leave and was reminded of the cancellation of leave due to scheduled demonstrations. Plaintiff did not report to work July 3-5, and submitted a questionable and inconsistent disability certificate from his doctor. ROI-02 at Ex 34. By plaintiff's own admission, see fn 8, he failed to give the hospital form concerning his wife to Lt. Thomas. Under these circumstances it is an entirely legitimate non-discriminatory/retaliatory reason that Lt. Thomas would place plaintiff on AWOL absent plaintiff's submission of proper documentation of illness of his wife and of himself to Lt.

---

[8] Plaintiff stated that "On June 29, 2002, I requested emergency leave from my supervisor Lt. Thomas so I could take my wife to the Hospital. From the outset he . . .denied me this leave and carried me unfairly as AWOL. Lt. Thomas ordered me to bring in a doctor slip. Because of Hospital shift changes I was not able to get a doctor slip. So instead I gave my Senior Commander, Capt. Webb Mitchell a copy of a Hospital Registration Form with my wife's condition and treatment. Due to bad on going working relations with Lt. Thomas (He Is So Distrustful), I decided to give the form to someone in authority over him." ROI-02 at Ex 42.

Thomas.

**Alleged Continuous Retaliation and Harassment from November 21, 2002, Through January 1, 2003, Regarding Weapon, Work Assignments, Vehicle, Denial of Leave, and Missing Supplies.**

The only discrete act of alleged retaliation for which plaintiff made timely contact with the EEO was number 10:  December 28, 2002 plaintiff learned that his leave request for January 1, 2003 was denied, but that his request for December 31, 2002 was approved.

Plaintiff has submitted no evidence showing  that the denial of one day of leave, for January 1, 2003, was a material adverse action.  See Short Depo.  Ex. 1 at p. 6 Interrogatory 14.

In *Totten v. Norton*, 421 F.Supp.2d 115, (D.D.C. 2006), this Court recently noted that

> Although it is not necessary for a Title VII reprisal plaintiff to show that the "alleged retaliation affected his pay or benefits-in other words, an adverse action may involve something short of what ordinarily would be considered a "personnel action"– a plaintiff nonetheless must point to an action that has "*materially* adverse consequences" for him.  *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C.Cir. 2002); *see also Rochon,* at 1219 ("[M]ateriality is implicit in the term 'discriminate' as it is used in Title VII.");  *Brown v. Brody,* 199 F.3d 446, 457 (1999) (plaintiff must demonstrate "materially adverse consequences ... such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm"). ... The touchstone of materiality in this context, the D.C. Circuit has said, is whether the "employer's challenged action ... would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 1219.

*Totten* at 120-21.   In granting the defendant's motion to dismiss the retaliation claim, *Totten* also stated that the Courts in this Circuit have held that purely psychic injuries -- e.g. embarrassment, public humiliation, loss of reputation, mere inconveniences --  do not qualify as adverse actions for purposes of  federal anti-discrimination statutes, noting that *Rochon*, at 1219 stated "[N]ot everything that makes an employee unhappy is an actionable adverse action."  *Totten*,  421 F.Supp.2d at 120 -121. In explaining the retaliation standard of "materially adverse" actions, the Supreme Court has stated  that

> We speak of material adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth "a general civility code for the American workplace.". . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty

slights or minor annoyances that often take place at work and that all employees experience.

*Burlington*, 126 S. Ct. at 2415 (citations omitted).  The Court also stated that the standard is to be objective.

> We refer to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here.

*Burlington*, 126 S.Ct at 2415 (Citations omitted).

It is a given that some police officers will have to work on holidays.  *See* Mitchell Dec. at ¶5.  ("As with all police departments. . .FPS Officers regularly have to work during holiday periods.").   Here, plaintiff was disapproved for one of the two days he requested leave during a holiday period and approved leave for the other day he requested.  Defendant has not submitted evidence of any objective harm to him because of being denied one day of leave on January 1, 2003.  Thus he has not established a prima facie case of retaliation.

Further, defendant has a legitimate non-retaliatory reason for its actions.  Plaintiff was needed for work on that day.  ROI-2 at Ex 8,Thomas affidavit at p. 4.

**PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT.**

Plaintiff also has alleged that he was "harassed" from November 21, 2002 through January 1, 2003.  Short Depo. at Ex.  4.  The alleged acts of harassment were:

1.   November 21, 2002,  his pistol was unavailable and he worked in the office.

2.   November 22, 2002, he was issued his weapon but no vehicle; he had to use a spare vehicle (not the one previously issued to him) without his equipment and supplies.

3.    November 26, 2002, plaintiff was assigned a vehicle but did not drive it home "because of no paper work and improper procedure."

4.   November 27, 2002, he signed for the new vehicle but it was a 2000 model and his

31

old vehicle was a 2002 model.  His equipment and supplies were still missing.

5.  November 28, 2002 he was denied leave for Thanksgiving Day by Lt. Thomas.

6.  December 3, 2002 plaintiff was given his equipment and supplies by Demiko Suggs, but plaintiff found that two computer speakers, a power inverter and vehicle cleaning supplies were missing.

7.  December 4, 2002 the remaining supplies were still missing.

8.  December 5, 2002 FPO Parry gave him a box with all the missing supplies.

9.  December 18, 2002 he learned that Lt. Thomas denied his request for leave for December 25 but approved his request for December 24,  and plaintiff chose not to take the approved leave.

10.  December 28, 2002 plaintiff learned that his leave request for January 1, 2003 was denied, but that his request for December 31, 2002 was approved.

To prove a hostile work environment plaintiff must establish that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment.  *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993).  To make a prima facie case of a hostile work environment, plaintiff must show: (1) that he is a member of a protected class; (2) that he was subject to unwelcomed harassment; (3) that the harassment occurred because of  his protected status; and (4) that the employer knew or should have known of the harassment and failed to take preventative action.  *Jones v. Billington*, 12 F.Supp. 2d 1 (D.D.C. 1997).  Beyond simply a mechanical test, courts judge the workplace conditions by looking at the totality of the circumstances.  These factors include the frequency of the conduct in question, its severity, its offensiveness, and its impact on work performance.  *See Faragher v. City of Boca Raton*, 524 U.S. 774, 787-88 (1998); *Raymond v. United States Capitol Police Board*, 157 F.Supp. 2d 50, 58 (D.D.C. 2001).

Vital to a claim is the connection between the alleged hostility and a plaintiff's protected status. "Everyone can be characterized by sex, race, ethnicity, and many bosses are harsh, unjust, and rude. It is therefore important in hostile environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Bryant v. Brownlee*, 265 F.Supp. 52, 63 (D.D.C. 2003) (*citing Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). The Supreme Court has stated its hope that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

Plaintiff's work environment as a whole cannot be said to have been one of severe and pervasive hostility that is full of discriminatory or retaliatory intimidation, ridicule, and insult such that the conditions of employment have been altered. *See Harris*, 510 U.S. at 21.

Plaintiff complains that he did not have his weapon on the first day he returned from his 30 days suspension. But, plaintiff admits that he worked in the office and lost no pay due to this. Short Depo. at p. 34-35. Thus, there was no material adverse action. The reason plaintiff's weapon was not available was because it had been placed in storage at the pistol range during his suspension and had not been retrieved for November 21. The weapon was available for plaintiff's use the next day. See ROI-2 Ex. 8, Thomas aff at p. 4, and Ex.28, Weapon Storage Policy (weapons stored at the pistol range when an officer is on suspension.)

Plaintiff complains that he was given a different vehicle to use when he returned to work. When plaintiff returned to work, he was given a vehicle which was available. His prior vehicle had been reassigned to someone else while he was on suspension. ROI-2 at Ex. 8, Thomas Aff. p. 4; Ex. 9, Mitchell Aff. p. 2; Ex. 10, Waldon Aff. at p. 1-2 ("It is policy that if an assigned driver is to be off duty for a long period of time, the vehicle will be reassigned to another driver The reason for this policy is that currently we have more officers than we have vehicles to assign.

33

. . . ."); Ex. 11, Suggs Aff. ("The vehicle was reassigned to Officer Cartwright who was returning to duty after being on a military leave.").

He also complains that he was missing the supplies which he had in his government vehicle prior to his suspension.  Officer Cartwright gave the items he found in plaintiff's prior vehicle to Logistics Contractor Demiko Suggs.  *Id.* at Ex. 11.   The items were placed in the cage area for safekeeping and were returned to plaintiff.  *Id.*  Plaintiff admits that all of his supplies were returned to him except for some window cleaner, armor all and a dust mop.   Short Depo. at p. 44.

Plaintiff also complains that he asked for two days off for Christmas and 2 days off for New Years but was only given one day for each.  However, plaintiff was needed to work on those days.  *Id.*  at Ex. 8, Thomas Aff. at p.  4.

The record simply is devoid of objective evidence that any of the Agency's decisions or actions were based on Appellant's race, sex, or retaliation.  Further, plaintiff has failed to establish an objectively hostile or abusive work environment.

 The limited incidents about which plaintiff complains do not show intimidation, ridicule or insult of any sort.   Plaintiff does not allege that Lt. Thomas ever made any discriminatory or retaliatory statements, slurs, or jokes.  Short Depo at p. 113-114.  None of the incidents recited by plaintiff show an environment *permeated* with discriminatory or retaliatory intimidation, ridicule and insult. Additionally, plaintiff has not established that any conduct was sufficiently severe to compensate for his failure to establish pervasive conduct.  *See Harris*, 510 U.S. at 23.

When viewed in its totality the evidence in plaintiff's's favor does not demonstrate that he was subjected to working in a workplace that was in any manner permeated "with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment. . . ." *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999)(citing *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (five mild

incidents of harassment over 16 month period did not create hostile working environment);

*Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir.1993) (same with two incidents

over three week period); *cf. Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) (sexual

assault sufficiently severe to create hostile work environment).   *George v. Leavitt*, No.03-5356

(D.C.Cir. May 17, 2005), Slip Op. at p. 19. (The Supreme Court has made it clear that "conduct

must be extreme to amount to discriminatory changes in the terms and conditions of

employment.") citing  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788(1998).   Similar to

*Keeley v. Small*

> [P]laintiff's alleged "hostile" events are the very employment actions he claims are
> retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a
> broader hostile work environment claim. *See Lester v. Natsios*, 290 F.Supp.2d at
> 33 ("Discrete acts constituting discrimination or retaliation claims are different in
> kind from a hostile work environment claim that must be based on severe and
> pervasive discriminatory intimidation or insult."). Plaintiff's claim simply does not
> meet the threshold of severe, pervasive and abusive retaliatory conduct, and thus
> defendant is entitled to summary judgment on this claim as well.

*Keeley v. Small,* 391 F.Supp.2d 30, 51 (D.D.C.2005).

**Kentucky Derby Deployment**

Plaintiff also claimed that he had been subjected to reprisal on April 30, 2003, when he

was not contacted concerning the deployment to the Kentucky Derby.  ROI-2 at Ex 5B,Short July

29, 2003 Affidavit.  Plaintiff can establish a prima facie case of retaliation solely based on the

rebuttable presumption of causality based on temporal proximity to plaintiff's March 3, 2003

initial contact with the EEO alleging discrimination due to the selection of Cassandra Talley to a

temporary acting position.

The person who made the deployment selections was Lt. Willie Sampson.  Lt. Sampson

was contacted and told to select a team of nineteen officers for deployment to the Kentucky

Derby.  ROI-2 at Ex 16, Sampson Aff. at p. 1.   The legitimate non-discriminatory reason for

defendant's action is that as Lt. Sampson called officers from a list, he was able to identify the

nineteen officers before he got to the plaintiff's name.  *Id.*

Plaintiff cannot rebut defendant's legitimate non-retaliatory reason and cannot otherwise show retaliation.   Although Lt. Sampson was aware that plaintiff had filed prior EEO complaints[9], he was not directly involved in the complaints. *Id.*  Specifically, as is discussed in detail below in the section pertaining to Ms. Talley's selection, Lt. Sampson had no involvement in the decision to select Ms. Talley to an acting supervisory position.  Thus, plaintiff cannot otherwise establish a causal connection between Lt. Sampson's selection of officers for the Kentucky Derby deployment and retaliation for protected activity.  *See Bieber v. Runyon*, 1996 WL 525372 at *11 (D.D.C. 1996) (plaintiff failed to establish causal connection between her non-selection and a previous EEO complaint where her earlier complaint was not based on actions taken or decisions made by the official who failed to select her for the position, and where plaintiff had not claimed that the official was involved in any way in the facts underlying her previous complaint);*see also Wada v. Tomlinson*, 2007 WL 1378516, *55 (D.D.C. 2007); *Broderick v. Donaldson*, 338 F.Supp.2d 30, 43 (D.D.C. 2004)(both citing *Bieber v. Runyon*).

**COMPLAINT 2 (ROI-14): Temporary Acting Sergeant Position**

In early 2003, FPS officers were assigned to protect the temporary Homeland Security Headquarters facility.  See ROI-14 at  Ex. 2C  p. 2.  FPS Lt. Maybelle Hallman was designated to be the deputy commander of a newly established Homeland Security unit. ROI-14 at Ex 5C, Hallman aff at ¶1.  In approximately January 2003, Lt. Hallman was asked by Patrick Moses, the Acting Deputy Regional Director, to select officers to be members of the new Homeland Security unit. *Id*. at ¶2.  She was told to pick good people who did not have disciplinary problems.  *Id*. Lt. Hallman went through the Navy Yard roster, and relying on her personal experience with the officers and their general reputation, she chose the officers she thought were best suited for the detail.  *Id*.  One of the individuals she chose was Lead Police Officer Cassandra Talley. *Id*.

---

[9]  Plaintiff has offered no evidence that Lt. Sampson was aware of the specific complaint concerning the selection of Lt. Talley to an Acting position versus plaintiff's earlier complaints .

After the officers, including Officer Talley, went on the detail to Homeland Security, upper management gave Talley a temporary promotion. ROI-14 at Ex 5C, Hallman Aff. at ¶2. Effective February 23, 2003, Officer Talley received a 120 day temporary promotion to the position Supervisory Police Officer. ROI-14 at Ex 9, Form 50 effective date 2-23-03 (Promotion NTE 22-Jun-2003). For the 120 day period, the temporary promotion raised the rate of Ms. Talley's total yearly adjusted basic pay rate to $55,857 and total yearly salary rate to $61,443. ROI-14 at Ex 9.

During the same time plaintiff's official title was Lead Police Officer, and his grade level was GS-9. ROI-14 at Ex 8. Plaintiff's duties as a lead police Officer included the duty to "act[] in the stead of the Supervisor when the Supervisor is not available." ROI 14 at Ex 6 p. 3. Effective January 12, 2003 plaintiff's pay rate was at an adjusted basic pay of $58,937 and total yearly salary rate of $64,832. *Id. at* Ex 8 at p. Thus, plaintiff was paid more than officer Talley. The ROI reflects that on two days during the 120-day period, May 18 and May 19, 2003, plaintiff was "acting sergeant." ROI-14 at Ex11.

Plaintiff alleged that he was discriminated against on the basis of age because Ms. Talley and a male corporal, received temporary promotions to sergeant. ROI-14 at Ex 5A, Short aff ¶7-8. He also alleges sex discrimination due to Officer Talley's temporary promotion.

During February/March 2003 three individuals allegedly received a temporary promotion to Supervisory Police Officer, GS-10:

| | |
|---|---|
| Issac Jackson | DOB 12/29/45 |
| Cassandra Talley | DOB 06/01/61 |
| Maurice Williams | DOB 03/16/47 |

ROI 14 at Ex 12.

**Prima facie case**

Plaintiff cannot establish a prima facie case of age or sex[10] discrimination because he was not similarly situated to the three officers he has identified as comparators.

Patrick Moses was the FPS Acting Deputy Regional Director for the National Capitol Region from October 29, 2002 to April 20, 2003. ROI-14 at Ex 5B ¶1. While working on the initiative to set up the new Homeland Security Unit, Mr. Moses informally discussed the initiative with the local union representative. *Id*. at ¶ 3. He learned that in general officers were concerned about standing a fixed post at the Homeland Security Headquarters. "For this reason, when officers did agree to accept the detail, management explored several options, which would serve as an incentive for the officers to stay at the new assignment." *Id.* "[T]he temporary promotions were given after the officers had been detailed. . . . The temporary promotions were simply an initiative to ensure that the morale of the individuals assigned to the Homeland Security unit remain at a high level." *Id*. at ¶3. Plaintiff was not on the Homeland Security Unit. Thus, plaintiff was not similarly situated to Officer Talley in Homeland Security who was promoted. Therefore he cannot establish a prima facie case of sex or age discrimination due to her promotion. Mr. Moses's belief that such an incentive would boost morale and help retain officers at Homeland Security also is the legitimate non-discriminatory reason for defendant's actions.

Plaintiff also cannot establish a prima facie case of age discrimination as to the alleged promotions of officers Jackson and Williams because there is not a significant difference between their ages and his. Since plaintiff was born in 1943, the difference in ages was 2 - 4 years less than plaintiff's. Therefore plaintiff cannot establish an essential element of an age

---

[10]   To the extent plaintiff is alleging reverse discrimination due to his sex, plaintiff has not demonstrated "additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminated against the majority.'" *See Bryant v. Leavitt*, 475 F.Supp.2d 15, 25 -26 (D.D.C.2007) (*quoting Harding v. Gray*, 9 F. 3d 150, 153 (D.C.Cir. 1993), and suggesting application of requirement of background circumstances in case involving African American male claiming sex discrimination when replaced by African American woman.)

discrimination claim.  *Teneyck v. Omni Shoreham Hotel,* 365 F.3d 1139, 1154-1155(D.C.
Cir.2004) ("evidence that the plaintiff was disadvantaged in favor of a "substantially younger"
person - regardless of whether that person was under 40 years of age - would be a basis from
which to infer age discrimination.");  *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 338 (6th
Cir.2003) ("The overwhelming body of cases in most circuits has held that age differences of less
than ten years are not significant enough to make out the fourth part of the age discrimination
prima facie case.") (collecting cases) and *Id*. at 339 -340 (establishing 6th Circuit test to be " in
the absence of direct evidence that the employer considered age to be significant, an age
difference of six years or less between an employee and a replacement is not significant.").

    Plaintiff also was not similarly situated to Officers Jackson and Williams.   Plaintiff's
shift was supervised by Captain Mitchell.  Mitchell Dec. at ¶ 1.  Officers Jackson and Williams
were not on Captain Mitchell's shift and were not supervised by him.  *Id*. at ¶ 7.   During
February and March 2003, Captain Mitchell did not request that plaintiff be placed in an 120-day
supervisory detail, because he could not have justified asking to put any corporal on such a detail
since he had sufficient staffing by the supervisors on the shift.  *Id*. at ¶ 6.

    Plaintiff also cannot establish a prima facie case of age discrimination concerning Officer
Talley's selection to the Homeland Security Unit.  Although Officer Talley was more than ten
years younger than plaintiff, plaintiff was not similarly situated to her.  Officers with disciplinary
problems were not eligible for the detail to Homeland Security.  ROI-14 at Ex 5C, Hallman aff
¶2 and at Ex.  5B, Moses Aff ¶5 ("While Corporal Short's name never came up in connection
with details or promotions, he would not have been a candidate . . .  because of his recent
disciplinary issues.. . . Because of the sensitivity and importance of the Homeland Security unit,
I would not have approved any officer, particularly a lead officer, for a detail or promotion who
had the disciplinary problems that  Corporal Short had.").  As has been detailed above, plaintiff
had been suspended for 30 days for failure to follow orders, use of offensive language to a

supervisor and being away without leave on July 4, a mandatory attendance day.  Officer Talley had no disciplinary record.  *Id.*

Plaintiff also cannot create an inference of discrimination because Ms. Talley was chosen for a 120-day detail without competition.  Pursuant to the National Agreement between GSA and the American Federation of Government Employees, competitive procedures only apply to temporary promotions of more than 120 calendar days.  ROI-14 at Ex 2D, p. 27 (Article 18 §2.B.).  *See also Id.* at Ex 2E, p. 231, OPM Reg, 5 CFR § 335.103 ("Agencies may in their discretion except the following actions from competitive procedures of this section: . . .  (iii) A temporary promotion or detail to a higher grade position . . .of 120 days or less.").  During the period of time in question, defendant did post a vacancy announcement for 5 temporary promotions to a GS-10 Supervisory Police Officer position not to exceed one year.  ROI-14 at Ex. 2F.  Plaintiff apparently did not apply;  he has alleged no EEO violation for non-selection to one of the posted vacancies.

Plaintiff also cannot establish a prima facie violation of the Equal Pay Act due to the temporary promotion of Officer Talley.  The Equal Pay Act prohibits employers from discriminating between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex.  29 U.S.C. § 206(d)(1).  To establish a violation of the Equal Pay Act, a plaintiff must demonstrate that "the employer paid male and female employees different wage rates for substantially equal work." *Turner v. District of Columbia,*  383 F.Supp.2d 157, 179 (D.D.C.,2005) *citing Broadus v. O.K. Industries, Inc.*, 226 F.3d 937, 941 (8th Cir.2000).

First, plaintiff has not presented any evidence that he was paid less than Officer Talley during the 120 day period when she was temporarily promoted. Officer Talley's forms SF-50 reflect that from February 23, 2003 to June 22, 2003, Officer Talley's yearly total salary rate was $61,443 and basic pay rate was $55, 857. ROI-14 at Ex 9. Plaintiff's forms-50 reflect that effective January 12, 2003, his total yearly salary rate was $64, 832 and his basic pay rate was $58, 938. ROI-14 at Ex. 8. Beginning March 9, 2003, plaintiff's total yearly salary rate was $64, 832 and his basic pay rate was $58,938. *Id.*; *see also* Jones Dec. Therefore, the evidence of record shows that plaintiff's salary always was more than that of Ms. Tally.

Plaintiff also has not presented any evidence that he did equal work on jobs the performance of which requires equal skill, effort, and responsibility. The position description for the Supervisory Police Officer (Sergeant) position reflects that the position is a full time supervisory position. ROI-14 at Ex 7. The Sergeant GS-10 position "is that of a first line supervisor."*Id.* at p. 11 Factor 5. Officer Talley worked full-time as a supervisor during the 120 day temporary promotion period. Hallman Dec. at ¶ 3. In contrast, plaintiff's Lead Police Officer position description reflects that "Incumbent assists the Team supervisor and fills in on a temporary basis during the supervisor's absences." ROI-14 at Ex. 6 p. 1. The ROI reflects only two days during the same 120 day period during which plaintiff was acting sergeant -- May 18 and May 19, 2003, ROI-14 at Ex11. Thus, the evidence does not show that plaintiff performed work equal to that of Talley during the 120 day period.

## CONSTRUCTIVE DISCHARGE

> Circuit law is clear that a "finding of constructive discharge depends on whether the employer deliberately made working conditions intolerable and drove the employee" out. *Clark v. Marsh*, 665 F.2d 1168, 1173 (D.C.Cir.1981) (internal citations and modifications omitted). Constructive discharge thus requires a finding of discrimination and the existence of certain "aggravating factors." *Id.* at 1174; *see also Dashnaw v. Pena*, 12 F.3d 1112, 1115 (D.C.Cir.1994). (These "aggravating factors" are those things that would force an employee to leave. *Clark*, 665 F.2d at 1174.)

*Mungin v. Katten Muchin & Zavis* 116 F.3d 1549, 1558 (D.C.Cir.1997). Additionally,

> To establish a constructive discharge, a plaintiff must leave her employment within a "reasonable time" after suffering an act of discrimination. *Smith v. Bath Iron Works*, 943 F.2d 164, 167 (1st Cir.1991). A decade is certainly not a "reasonable time" to leave a job which has become intolerable. *See, e.g., Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 613 (1st Cir.2000) (holding that a plaintiff who resigned seven months after alleged discriminatory acts could not claim constructive discharge).

*Turner v. District of Columbia,* 383 F.Supp.2d 157, 172 (D.D.C.2005).

Plaintiff asserts that the acts of discrimination and retaliation which forced him to retire in 2005 are those acts in the previously discussed EEO Reports of Investigation GSA case No.03-NCR-WPS-GSA-2 and No. 03-NCR-WPS-GSA-14. Short Depo. at p.15- 21; and *Id* at Ex. 1, Interrogatory No. 7; *Id.* at Ex. 2,¶2-3; *Plaintiff's Opposition to Defendant's Motion for Partial Dismissal*, Docket Document No. 12 at p. 2. The last allegedly discriminatory/retaliatory act plaintiff complained of was the April 30, 2003 failure to contact plaintiff concerning the deployment to the Kentucky Derby. ROI-2 at Ex 5B, Short July 29, 2003 Affidavit. Plaintiff's resignation in February 2005, over two years after the last alleged act of discrimination or retaliation, was not done within a "reasonable time." *See also Mayers v. Laborers' Health & Safety Fund of North America*, 478 F.3d at 370. ("We have not yet had occasion to say whether, after *Morgan*, constructive discharge claims (like hostile work environment claims) by their "very nature involve [ ] repeated conduct," and are thus amenable to continuing violations analysis. *Morgan*, 536 U.S. at 115, 122 S.Ct. 2061. Assuming that they do, *Morgan*'s second limiting principle bars Mayers's claim. *Morgan* requires that Mayers show one offending act within the statutory period, and as this court recently noted constructive discharge claims "must be predicated on a showing of either intentional discrimination, or retaliation." *Carter v. George Washington Univ.*, 387 F.3d 872, 883 (D.C.Cir.2004) (internal citation omitted). Because Mayers has failed to identify a single act of discrimination or retaliation within the 180-day period, her constructive discharge claim fails as a matter of law.") Here, plaintiff Short has failed to identify an act of discrimination or retaliation within 45 days of his resignation in February 2005,

and as was discussed above, failed to contact the EEO at all with a claim of constructive discharge.

Further, plaintiff has not presented objective evidence of any "aggravating factors" which forced him to retire.  *See Kalinoski v. Gutierrez,*  435 F.Supp.2d 55, 78 -79 (D.D.C.2006)("The kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination.").

Plaintiff was asked about acts other than those described in his EEO complaints which caused him to retire.  Short Depo. at p.  109 -110.  His response was

> I would say I went – let's see, like through a change for nine years of stress and not being promoted . . . Tally had never been on deployment, never had the experience.  Two guys made sergeant when I should have. . . .I was always confronted by my coworkers about how they're treating me, and they couldn't see how I could stay there and take that.  I had to eat crow every  day for nine years.

Short Depo at p.  109-110.   However, the last of the promotions of "two guys" to which plaintiff alludes occurred in the late 1990's, and plaintiff did not file a discrimination claim about either promotion.  *Id.* at p. 110-112.    Plaintiff also stated that he considered as acts of retaliation temporary 90 day promotions which he did not receive.  *Id*. at p. 113-114.   He stated

> Well, the one that hurt me the most was Lieutenant Talley because, see, the other guys that received the promotions, they had a lot of time on the force too.   They were in my age group.   But Lieutenant Talley when they brought her in, she was a lot younger . . . .
> Q.  So it was her temporary promotion that really bothered you?
> A. Right, yes.

*Id*. at p. 113-114.

Although plaintiff may have been disappointed  for nine years due to not receiving any permanent or temporary promotion, he has not proven that his lack of promotion is due to any discriminatory or retaliatory act on the part of defendant, nor has he demonstrated any discriminatory/retaliatory effort to pressure him to resign.

As the Fourth Circuit has stated,

[e]very job has its frustrations, challenges and disappointments; these inhere in the

nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Turner v. District of Columbia*,  383 F.Supp.2d 157, 171 (D.D.C.2005).

## CONCLUSION

Accordingly, based on the foregoing and the entire record herein, the defendant's motion for summary judgment should be granted.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

_____/s/_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970