## Page 13

1 organization like FEMA, the government, so mostly for your
2 food.
3    Q. And was that on a reimbursement basis?
4       MS. HARDNETT: Objection, form.
5       WITNESS: No.
6       BY MS. FIELDS:
7    Q. How did you get per diem?
8    A. Well, I had a credit card. Team Leaders, we all had
9 credit cards and we used that credit card.
10    Q. So you would use the credit card to buy meals?
11    A. Right.
12    Q. And then did you pay the credit card?
13    A. Yes, yes. You have to pay the credit card.
14    Q. So you would buy a meal.
15    A. Um-hum.
16    Q. You would put it on your credit card. Then you
17 would pay it on your credit card?
18    A. Right.
19    Q. But then would you put in a request for
20 reimbursement to the Agency for the amount that you paid on
21 your credit card?
22    A. Yes. There's a form that we fill out at the end of
23 our tour.
24    Q. Okay. So the per diem was the reimbursement of the
25 meal charges on your credit card, is that correct?

## Page 14

1    A. Right.
2    Q. On your government credit card?
3    A. Right.
4    Q. Okay. And your transportation, I take it, was paid
5 for by the Agency?
6    A. Yeah. That was taken care of by the Agency.
7    Q. Okay. So when you went -- when you say that you
8 lost money because you did not go on a deployment, are you
9 saying that you lost overtime hours that you would have worked
10 on the deployment?
11    A. Yes.
12       MS. HARDNETT: Objection.
13       BY MS. FIELDS:
14    Q. And is there any other money that you would have
15 lost other than overtime when you did not go on a deployment?
16    A. Except for my per diem. In some areas your per diem
17 is very high for expenses. It all depends on the area.
18    Q. But that's reimbursed -- that is put on your
19 government credit card and then what you pay is reimbursed, is
20 that correct?
21    A. Yes.
22    Q. Okay. So other than your per diem and the overtime,
23 are there any other monies that you felt you lost by not going
24 on deployment?
25    A. No.

## Page 15

1    Q. Okay. Now, Mr. Short, I received from your attorney
2 Plaintiff's Answers to Defendant's Original Set of
3 Interrogatories. Have you reviewed this document and verified
4 it?
5    A. Yes, uh-huh.
6    Q. Okay. Do you have a verified copy of it?
7       MS. HARDNETT: Can we go off the record for a
8 minute? Counsel, I can provide that to you. We have a copy
9 and I faxed a copy --
10       REPORTER: One second, please. Are you willing to
11 go off the record?
12       MS. FIELDS: We can just leave it on the record.
13       MS. HARDNETT: I'll fax it to you.
14       MS. FIELDS: If you've read, if you would review
15 this document and if it's correct, would you sign it, please?
16       MS. HARDNETT: Counsel, I will fax you a copy of
17 that document, the signed copy today, because it's going to
18 take him quite awhile to read through the entire document.
19       MS. FIELDS: Well, I want to make -- I'm here on a
20 deposition and those are his responses. I want to be able to
21 ask him questions about it. If he needs time to review it
22 now, I would like him to review it now. I would like a
23 verified copy so I have something to work from.
24       MS. HARDNETT: Okay. I'll give you a verified copy.
25 I'm not going to instruct him to sign this particular copy

## Page 16

1 today. I haven't had time to review it. I will provide you
2 with a verified copy today.
3       MS. FIELDS: Are you saying --
4       MS. HARDNETT: I wanted to give this to you as soon
5 as possible.
6       MS. FIELDS: Are you saying that you sent the
7 Answers to Interrogatories?
8       MS. HARDNETT: Well, what I'm saying to you is that
9 I --
10       MS. FIELDS: Wait, wait. Excuse me. I'm asking a
11 question.
12       MS. HARDNETT: Sure.
13       MS. FIELDS: Okay. Are you saying that you sent me
14 these answers and they've not been reviewed by you or your
15 client?
16       MS. HARDNETT: What I'm saying to you is that I
17 faxed something to you. I have not reviewed the document and
18 I don't know if that's what I sent to you. I don't know if
19 you substituted --
20       MS. FIELDS: I would like you to take --
21       MS. HARDNETT: I don't know what it is.
22       MS. FIELDS: -- time right now. I want you and your
23 client to please review the document because I intend to ask
24 your client questions concerning that document.
25       MS. HARDNETT: Counselor, I would remind you to

Page 17

1 maintain a professional demeanor during this deposition
2 because if you do not, the deposition will end.
3     MS. FIELDS: Ma'am, I am --
4     MS. HARDNETT: What I'm saying to you is that I will
5 provide you with a verified copy as soon as I get back to my
6 office today. I sent these to you. It is not unusual to get
7 interrogatories out to opposing counsel if they request it as
8 soon as possible, and that's what we did. I have a verified
9 copy in my office and I will provide that to you today.
10     MS. FIELDS: Ma'am --
11     MS. HARDNETT: Now if you want to ask my --
12     MS. FIELDS: Ma'am --
13     MS. HARDNETT: If you want -- let me finish this
14 time. If you want to ask my client questions about the
15 interrogatories and you would like him to review them as you
16 ask him about the questions, then he can do that, but to ask
17 him to sit here to read through this entire document and then
18 to go back and respond to the questions, I think is a bit
19 much. If you want to waste your time to do that, that's fine,
20 but I would ask you that you not waste my client's time or my
21 time to do that.
22     MS. FIELDS: Ma'am, I'm asking your client to sit
23 down and just read the document right now.
24     MS. HARDNETT: Sure. Would you -- take your time,
25 Mr. Short, and read through this document.

Page 18

1     (Long pause)
2     MS. FIELDS: I'll note for the record that Mr. Short
3 just signed the document that I handed to him and I'll ask the
4 court reporter to mark that as Government Exhibit Number 1.
5 (Whereupon, the document that was referred to as Exhibit
6 Number 1 was marked for identification.)
7     BY MS. FIELDS:
8     Q. Now, Mr. Short, Government Exhibit Number 1 you've
9 had a chance to review, is that correct? You have to say yes
10 or no --
11     A. Yes, yes.
12     Q. -- so that we can get it down. And you've signed
13 this document, is that correct?
14     A. Yes.
15     Q. And do you verify that this is your response to the
16 Defendant's request for responses to interrogatories?
17     A. Yes.
18     Q. Do you wish to make any corrections or changes to
19 that document?
20     MS. HARDNETT: Mr. Short will provide whatever
21 documentation is required to supplement his interrogatories,
22 as required by law --
23     MS. FIELDS: I had a question. My question was Mr.
24 Short --
25     MS. HARDNETT: -- through his counsel.

Page 19

1     BY MS. FIELDS:
2     Q. Mr. Short, do you wish to make any corrections or
3 changes to the interrogatories at this time?
4     A. No. In reference to these -- no, I don't see
5 anything. No, I don't.
6     MS. FIELDS: Would you mark the next document as
7 Exhibit Number 2, please?
8 (Whereupon, the document that was referred to as Exhibit
9 Number 2 was marked for identification.)
10     MS. FIELDS: I'm giving Mr. Short a copy and giving
11 it to your attorney. I'm going to let you to keep the copies
12 so I don't get them all mixed up with other stuff.
13     (Long pause)
14     WITNESS: Okay.
15     BY MS. FIELDS:
16     Q. Have you had a chance to review it?
17     A. Yes, uh-huh, yeah.
18     Q. The first document is an affidavit that's Exhibit A.
19 Is that affidavit signed by you?
20     A. Yes, uh-huh.
21     Q. Okay. Is that affidavit still correct?
22     A. Um-hum.
23     Q. In the affidavit you talk about the conduct which
24 led to your constructive discharge, is that correct?
25     A. Um-hum.

Page 20

1     Q. And you indicate that it's based on the two charges
2 which you filed with the EEO Commission in October of 2002, a
3 second charge filed in April of 2003, is that correct?
4     A. Right.
5     MS. HARDNETT: Objection. Counsel, I would note
6 that your question is leading. The conduct that I challenge
7 -- to file the charges encompass the same misconduct that led
8 to my constructive discharge.
9     MS. FIELDS: I asked is that in relation to the two
10 charges which you filed with the Equal Employment Opportunity
11 Commission in October of 2002 and April 2003.
12     MS. HARDNETT: And objection again, and I want to
13 state that it's very specific and it states encompassed, which
14 means it entailed, it was a part of, it was including in or
15 includes the --
16     BY MS. FIELDS:
17     Q. Well, my question, Mr. Short --
18     A. Okay.
19     Q. Your claim for constructive discharge, okay --
20     A. Um-hum.
21     Q. -- does it include the charge that you filed before
22 the Equal Employment Opportunity Commission which you filed
23 October 2002?
24     MS. HARDNETT: Objection. The wording is quite
25 clear --

Page 21

1    MS. FIELDS: Counsel --
2    MS. HARDNETT: -- and it states encompassed. That
3 is my objection and --
4    MS. FIELDS: I understand what the wording said.
5 Now I'm asking a question. My question is your constructive
6 discharge claim, are you claiming that it's based on in part
7 the charge that you filed with the Equal Employment
8 Opportunity Commission in October of 2002?
9    MS. HARDNETT: Objection. Ma'am, I'd like an answer
10 from your client. Your objection is noted. I'd like an
11 answer from your client. I would note that counsel is
12 pointing out something to the client.
13    WITNESS: Yes. It encompassed -- will you kind of
14 explain that to me? I'm a little confused.
15    BY MS. FIELDS:
16    Q. Okay. You said I filed two charges with the Equal
17 Employment Opportunity Commission, paragraph 2. I filed the
18 first charge in October 2002. I filed the second charge in
19 April of 2003, is that correct?
20    A. Right.
21    Q. Okay. Now those two charges that you are talking
22 about, are those the charges that ultimately ended up in a
23 case that was George Short, GSA Case Number 03-NCR-WPS-GAS-14?
24    A. Right, uh-huh.
25    Q. And was the other one Case Number GAS-03-NCR-WPS-

Page 22

1 GAS-2?
2    A. Yes.
3    Q. Okay. And in those two case you've made claims
4 concerning discrimination, is that correct?
5    A. Yes.
6    Q. Okay. Now those -- concerning discrimination for
7 those two cases --
8    A. Yes.
9    Q. -- are the facts that you gave to the EEO counselor
10 the facts that you also claim led to your constructive
11 discharge?
12    A. Yes.
13    Q. Okay. Are you claiming that there's anything that
14 led to your constructive discharge other than the facts that
15 you gave to the EEO counselor for those two cases?
16    A. Yes. It wasn't actually claims that was made.
17 There are some acts that I didn't list there.
18    Q. What are the acts that you did list in those two
19 claims that you claim led to your constructive discharge?
20    A. Now on those acts, I may not have witnessed to
21 verify that it was -- but there were occasions -- a incident
22 that happened concerning a particular individual, a
23 lieutenant, that put me in a kind of a pretty bad position.
24 There's a locker room that the officers -- all the officers
25 share. The supervisory had a tendency to walk through that

Page 23

1 locker room to go to the men's room. They have their own
2 men's room upstairs. And a number of times when I was there
3 at my locker changing clothes he would walk through. Now this
4 lieutenant is gay.
5    Q. Who's the lieutenant?
6    A. Thomas.
7    Q. Okay. He walked through the locker room.
8    A. Right. He had a habit of putting his hand on you,
9 touching you. Everyone knew he was gay. You know, everyone
10 knew that. But he wasn't really open with it, but it was
11 known.
12    Q. How did you know he was gay?
13    A. Well, we seen him. He had a little boyfriend.
14 Sometimes he'd come around and different things occurred. The
15 young man was staying with him. He would call them or him,
16 and when he get angry with him, he'd spill all his business
17 out, let you know what's happening, you know what I mean, that
18 sort of thing, you know.
19    Q. Are you saying that Lieutenant Thomas put his hands
20 on you?
21    A. Oh, yeah, yeah, all the time.
22    Q. How did he put his hands on you?
23    A. Touched me, physically touching.
24    Q. Where did he physically touch you?
25    A. Anywhere on my body, you know, at the time, which

Page 24

1 could be anywhere, you know, above my waist.
2    Q. He touched you above your waist?
3    A. Right.
4    Q. When did he touch you above your waist?
5    A. A number of times.
6    Q. When?
7    A. Oh, gee, that was before I filed the complaint.
8    Q. This was before you filed these two complaints?
9    A. Right.
10    Q. Okay. And he touched you above the waist?
11    A. Right, right, right.
12    Q. Before October of 2002?
13    A. Right.
14    Q. And he touched you above the waist before April of
15 2003?
16    A. Yeah.
17    Q. Okay. Where did he touch you above the waist?
18    A. My shoulders, arm, whatever.
19    Q. Okay. And --
20    A. If he wanted your attention, he'd grab hold of you.
21    Q. If he wanted your attention, he would grad a hold of
22 you?
23    A. Right, right, yeah.
24    Q. And he would grab a hold of your arm?
25    A. Yes, uh-huh.

Page 25

1  Q. And what else did he do?
2  A. That's basically it. He touched me above my waist,
3  anywhere above my waist.
4  Q. So are you saying that when he wanted attention he
5  would touch you above your waist, is that what your testimony
6  is?
7  A. Whenever --
8     MS. HARDNETT: Objection.
9     WITNESS: Yeah, sometimes.
10    BY MS. FIELDS:
11 Q. Did he ever touch you sexually?
12 A. No.
13 Q. Okay. Are you claiming that he ever touched you
14 sexually?
15 A. No.
16 Q. Okay. Did you ever complain about his touching you?
17 A. Yes.
18 Q. Who did you complain to?
19 A. Years ago I went to a law firm in Rockville,
20 Maryland concerning him and they wrote a letter to the
21 captain. The captain called me in his office and he talked to
22 me about it, and he advised me not to pursue that case and
23 told me to leave it alone.
24 Q. And when was this?
25 A. This was less than a year prior to this complaint,

Page 26

1  this incident, and I think that's what really triggered the
2  whole thing.
3  Q. So this was in --
4  A. That triggered all my harassment.
5  Q. This was in 2001?
6  A. Yeah, about 2001.
7  Q. And you complained to who at the Agency?
8  A. What do you mean?
9  Q. Who did you complain -- you said you talked to
10 someone at the Agency about this. Who did you complain to at
11 the Agency about this?
12 A. Captain Mitchell.
13 Q. Captain Mitchell.
14 A. Yes.
15 Q. And was this just you or with the law firm that you
16 had gone to see?
17 A. Just me.
18 Q. And was this --
19 A. This was before I went to the law firm.
20 Q. This was before you went to the law firm. When in
21 2001 approximately did you complain to Captain Mitchell about
22 this?
23 A. I don't know the exact date because that was so long
24 ago.
25 Q. And what did you tell Captain Mitchell?

Page 27

1  A. Well, I complained to him about his behavior.
2  Q. What did you tell --
3  A. When I was walking through the locker room when I
4  would change clothes, nobody else around and no other
5  lieutenant or sergeant walked through that locker room. He
6  the only one who walked through there.
7  Q. So you said you told Captain Mitchell what about him
8  walking through the locker room?
9  A. How he would always be around, seemed like he was
10 always around. And like if I'd go to do something in the roll
11 call room, he would come in there looking around like he was
12 looking for someone, you know, and like a stalking thing, you
13 know.
14 Q. You're saying that Lieutenant Thomas was stalking
15 you?
16 A. Well, I say it's like a stalking thing.
17 Q. Well, tell me -- describe it to me.
18 A. It's like I said a few minutes ago, when I was in
19 the roll call room he'd come in there, take a look around like
20 he's looking for someone.
21 Q. What's the roll call room?
22 A. The roll call room where we do roll call. He always
23 coming around in the area, you know. But I think this is what
24 really triggered the whole thing for harassment from this
25 particular individual when I filed -- when it caused me to

Page 28

1  file an EEO complaint or whatever.
2  Q. So did you file something in writing concerning him
3  touching you above the waist and walking into --
4  A. No. I went to the captain. I talked to him
5  verbally about it.
6  Q. And what happened after you talked to this captain?
7  A. He said well -- he said he would talk to Lieutenant
8  Thomas about it, but nothing was done. He continued to do it.
9  And that's when I went to talk to the law firm about it.
10 Q. And you talked to a law firm about it. And was
11 anything filed with the Agency after you talked to the law
12 firm about it?
13 A. No. No complaint was filed to the Agency, not by me
14 --
15 Q. Okay. And --
16 A. -- because I advised by Captain Mitchell to leave it
17 alone.
18 Q. And how long did Lieutenant Thomas continue touching
19 you above your shoulders?
20 A. After that -- well, after I filed my claim it
21 stopped.
22 Q. It stopped?
23 A. Right.
24 Q. After you filed which claim?
25 A. The first claim with EEO.

Page 29

1    Q. After you filed the first claim with EEO it stopped?
2    A. Right.
3    Q. Okay. And what about him walking through the locker
4 room?
5    A. I said -- well, it stopped after I filed my first
6 claim.
7    Q. So that stopped after you filed your first claim,
8 too?
9    A. Yeah. I said he stopped.
10   Q. He stopped all of that after you filed the first
11 claim?
12   A. Yes.
13   Q. Okay. And you filed the first claim -- and you say
14 your first claim -- let me show you --
15       MS. FIELDS: What's our next exhibit number?
16       REPORTER: 3.
17       MS. FIELDS: 3.
18 (Whereupon, the document that was referred to as Exhibit
19 Number 3 was marked for identification.)
20       BY MS. FIELDS:
21   Q. Okay. Let me show you Exhibit Number 3 which is a
22 formal complaint from -- with a date after your signature of
23 October the 23rd, 2002. Is that the first claim that you're
24 referring to?
25   A. Yeah. Well -- yeah. Well, really, yeah, it stopped

Page 30

1 after this.
2    Q. Okay.
3    A. Yeah, it stopped after this.
4    Q. Okay. Now other than what you've just talked to us
5 about about Lieutenant Thomas, is there anything else that is
6 the basis of your constructive discharge claim? You have to
7 say yes or no. Shaking your head --
8    A. No.
9    Q. Okay. So that's all?
10   A. Um-hum.
11   Q. Okay.
12       MS. HARDNETT: Objection, leading. I don't
13 necessarily know that the client understands the context in
14 which opposing counsel phrased it, and I want to objection
15 noted for the record.
16       BY MS. FIELDS:
17   Q. Well, let's try to be clear, okay? You have a claim
18 in for constructive discharge --
19   A. Um-hum.
20   Q. -- that you were forced to retire, is that correct?
21 Is that what that means to you?
22   A. Oh, I thought -- oh, I got that mixed up with the 30
23 days suspension. I'm sorry.
24   Q. Well --
25   A. I thought you --

Page 31

1    Q. Okay. Well, let's leave -- let's go back.
2    A. Okay.
3    Q. Let's talk about constructive discharge. By that I
4 mean a claim that you were forced to retire.
5    A. Right, uh-huh, yeah.
6    Q. Okay.
7    A. Well, no. That's -- no. It was a lot of more that
8 forced me into retirement. It was nothing -- it's nothing
9 different than what I filed, though.
10   Q. So there's nothing different than what you filed in
11 the two cases that we talked about, the GAS --
12   A. No. You're right. These two cases here?
13   Q. Um-hum.
14   A. Right, right, right.
15   Q. Okay. There's nothing in addition to those two that
16 you're talking about that caused you to retire?
17   A. No.
18       MS. HARDNETT: Objection. Counsel, he's already
19 answered that question.
20       BY MS. FIELDS:
21   Q. And when we talked about Lieutenant Thomas just now,
22 did that have anything to do with your retiring -- feeling you
23 were forced to retire?
24   A. What do you mean, the initial act that I was
25 complaining about?

Page 32

1    Q. When you were talking about him walking through the
2 locker room or touching you.
3    A. Well, that led up to that point because that was the
4 retaliation that I received and I reckon might have stemmed
5 from that, so that would be considered a part of it also.
6    Q. That harassment and retaliation --
7    A. Um-hum.
8    Q. -- was that reflected in the two charges which you
9 filed with the EEO?
10   A. Yes.
11   Q. Was it anything other than those charges that you're
12 claiming forced you to retire?
13       MS. HARDNETT: I'm going to object again. I think,
14 counselor, if you want to be -- we're talking about a 37 year
15 period of time. If you want to be specific about a specific
16 period of time, I think you should ask --
17       MS. FIELDS: If you have an objection, let's do them
18 outside the presence of the witness. If you like, we can step
19 outside and you can make an objection.
20       MS. HARDNETT: Sure, we can do that.
21       MS. FIELDS: Okay?
22       MS. HARDNETT: We can do that, but I will object.
23       MS. FIELDS: Okay, that's fine.
24       BY MS. FIELDS:
25   Q. Now you were suspended, is that correct?

### Page 33

1  A. Yes.
2  Q. And I'm just trying to get the dates of the
3  suspension. Was that October the 22nd through November the
4  20th of 2002 when you were suspended.
5  A. Right.
6  Q. Okay. And then you returned on November the 21st,
7  is that correct? Okay. Now in your --
8      MS. FIELDS: What number are we up to?
9      REPORTER: Number 4.
10 (Whereupon, the document that was referred to as Exhibit
11 Number 4 was marked for identification.)
12     BY MS. FIELDS:
13 Q. I'm showing you Exhibit Number 4. Do you recognize
14 Exhibit Number 4?
15 A. Yes, uh-huh.
16 Q. Okay. And is this a document that you gave to Avis
17 Johnson?
18 A. Yes.
19 Q. And is it signed by you?
20 A. Yes.
21 Q. Okay. And the last page, is this also another
22 document you gave to Ms. Johnson?
23 A. Yes.
24 Q. And is that also signed by you?
25 A. Yes.

### Page 34

1  Q. Okay. Now going back to the first page of Exhibit
2  4, okay, now you indicate that -- I'll read the first
3  paragraph. I would like to make an amendment to my formal
4  complaint filed on October the 23rd, 2002, concerning
5  harassment and discrimination. This additional complaint,
6  dated November 21, 2002 through January 1, 2003, concerning
7  retaliation and harassment after filing complaint with EEO and
8  after 30 days suspension. Some base -- I guess that means
9  basis -- of retaliation and harassment are listed below. Is
10 that correct?
11 A. Um-hum.
12 Q. Okay. Now let's go through the exhibit. Okay. Was
13 that a yes or a no?
14 A. Beg your pardon.
15 Q. Your counsel just reminded me. You have to answer
16 yes or no instead of saying um-hum, so was that a yes or a no?
17 A. Yes.
18 Q. Okay. We got to do that for our court reporter.
19 Okay. Now Number 1 says November the 21st no weapon was in
20 the safe for me to go to complete the uniform. Is that
21 correct?
22 A. Yes.
23 Q. And you say you worked in the office because of no
24 weapon?
25 A. Yes.

### Page 35

1  Q. Okay. Did you lose any money because you had to
2  work in the office?
3  A. No.
4  Q. Okay. Now on November the 22nd -- yes?
5  A. Correction.
6  Q. Okay.
7  A. By me not having a weapon at that time, if they
8  wanted me to work on another shift overtime, it would have
9  been a problem. There could have been a loss of my --
10 Q. There could have been?
11 A. Yes. There could have been a loss of pay, which it
12 happened on one occasion because the supervisor didn't come in
13 and I was asked to work overtime because they didn't have a
14 supervisor, and occasionally that happens.
15 Q. Did occur on November the 21st?
16 A. No, it did not.
17 Q. Okay. Now November the 22nd you say the weapon was
18 issued, but no vehicle, so you got your gun on -- a gun on
19 November the 22nd?
20 A. Yes.
21 Q. Okay. But no vehicle?
22 A. No.
23 Q. Okay. So you had no vehicle to use?
24 A. No.
25 Q. It says I had to use a -- does this -- I had to use

### Page 36

1  a spear vehicle, meaning spare vehicle?
2  A. Yes, but that wasn't on the same date. What was
3  that, the 22nd?
4  Q. Let's look at November the 22nd.
5  A. That's the next day, yeah.
6  Q. Yeah, November the 22nd. It says November the 22nd
7  at 3 p.m. -- I figure that's when you start duty -- you
8  started duty at 3 p.m.?
9  A. Yes.
10 Q. Okay. Weapon was issued, but no vehicle.
11 A. No vehicle, no.
12 Q. Okay. Your assigned vehicle -- the vehicle that you
13 were given did not have your equipment and supplies. Is that
14 what you mean?
15 A. Yes.
16 Q. Okay. But you were given a spare vehicle to use, is
17 that correct?
18 A. Yes.
19 Q. Okay. But it didn't have your equipment and
20 supplies?
21 A. No.
22 Q. Okay. You say which also included your body armor.
23 A. True, yes.
24 Q. Okay. So were you missing body armor that day?
25 A. Yes.

Page 37

1  Q. And did they have any spare body armor to give you?
2  A. No.
3  Q. Okay. So did you use the vehicle on that day?
4  A. Yes. Yes, I did.
5  Q. And were you on patrol duty or whatever you do that
6 day?
7  A. Yes.
8  Q. Okay. Did you lose any money that day because you
9 did not have your vehicle?
10  A. No.
11  Q. Okay. Now it says November the 26th -- it says
12 Lieutenant gave me a book and a key to Vehicle Number 981.
13 What do you mean a book? What does that mean?
14  A. It's a log book for the vehicle.
15  Q. Okay. It says he stated this is your assigned
16 vehicle with no paperwork, so I did not drive Vehicle 981 home
17 because of no paperwork and improper procedure on November the
18 26th, is that correct?
19  A. Correct.
20  Q. Tell me what are the rules concerning your being
21 able to drive a vehicle home or what were the rules then
22 pertaining to your being able to drive the vehicle home.
23  A. There were certain things you have to do, just
24 simple stuff like vehicle checks, making checks on your
25 vehicle, and they just had a little form there telling you

Page 38

1 different things, what to do before you pull off in your
2 vehicle, just safety stuff, you know, information, safety
3 information or whatever.
4  Q. So you could not drive it home because of what
5 reason on November the 26th, 2002?
6  A. The 26th? There was no reason that I couldn't drive
7 it home.
8  Q. You say here I did not drive Vehicle 981 home
9 because of no paperwork.
10  A. Oh, oh, oh, no. I had to sign for the vehicle.
11 There wasn't no paperwork for me to sign for the vehicle that
12 I ultimately used, that particular vehicle, to take it home.
13  Q. So the --
14  A. There was no paperwork for me to take it home.
15  Q. There's certain paperwork that you have to sign --
16  A. Yes, a form, yeah, yeah.
17  Q. -- to take it home? And you didn't have the form,
18 is that what you're saying?
19  A. No, no.
20  Q. Okay. Did you get the proper paperwork the next
21 day?
22  A. I don't recall.
23  Q. Look at number 4 on there concerning November the
24 27th, 2002. It says --
25  A. Yeah. The 27th I signed for it, yeah.

Page 39

1  Q. And you got the proper paperwork?
2  A. Right, yeah, um-hum.
3  Q. Were you able to drive the vehicle home then?
4  A. Yes.
5  Q. How did you get home on the 26th?
6  A. I drive my personal vehicle.
7  Q. Okay. I take it you came in on the 26th in your
8 personal vehicle?
9  A. Yes.
10  Q. On the 27th did you drive the vehicle home, the
11 government vehicle home?
12  A. Yes.
13  Q. How did you get to work on the 27th?
14  A. With my personal vehicle.
15  Q. Okay. And what happened to your personal vehicle
16 when you drove your government vehicle home?
17  A. I left it there on the property.
18  Q. So your personal vehicle stayed on the property?
19  A. Yes.
20  Q. Okay. When you say the property, that means where?
21  A. At my headquarters.
22  Q. So you left your personal vehicle at home?
23  A. No, headquarters.
24  Q. So you left your personal vehicle at headquarters?
25  A. Right.

Page 40

1  Q. And then you drove home in the government vehicle?
2  A. Right.
3  Q. Okay. And when you drive back and forth in the
4 government vehicle who pays for the gas?
5  A. The government.
6  Q. Okay. And who pays for the upkeep of the vehicle?
7  A. The government.
8  Q. Okay. So when you did not have use of the
9 government vehicle on November the 26th you lost the gas money
10 that you had to pay for driving home with your personal
11 vehicle, is that correct?
12  A. Yes.
13  Q. Okay. How many miles away is your home?
14  A. Seven miles.
15  Q. Seven miles?
16  A. Yes.
17  Q. And do you know approximately how much gas you use
18 in seven miles?
19  A. No.
20  Q. But that would be the amount of gas we're talking
21 about from your about seven miles worth of gas from your home
22 to headquarters?
23  A. Oh, I don't have that exact information.
24  Q. Okay. But your home is approximately how far from -
25 --

Page 41

1  A. About seven miles.
2  Q. About seven. So that would be the distance we're
3  talking about you would have to drive you were driving your
4  personal vehicle.
5  A. One way, seven miles one way.
6  Q. Okay. So 14 miles two ways?
7  A. Right.
8  Q. Okay. Now you indicate that your equipment and your
9  supplies were missing when you came back, the equipment and
10 supplies from your car, is that correct?
11 A. Yes.
12 Q. All right. And then December the 23rd [sic], item
13 number 6, says I went to work one hour early to get my
14 equipment and supplies. I went to Logistics to get my
15 equipment. Demiko Suggs was in charge, and at this time he
16 gave me my equipment and supplies. There was no inventory
17 slip to sign because none was taken by anyone. I make a quick
18 check because I had to go to roll call and not knowing at this
19 time that all my supplies were not there. Later that night I
20 made another check and found the following items missing: Two
21 computer speakers, power inverter, and vehicle cleaning
22 supplies. Is that what you have written there?
23 A. Yes.
24 Q. So on December the 3rd you say you went to work
25 early to get your equipment?

Page 42

1  A. Yes.
2  Q. Did you know that you were going -- is that why you
3  went early, specifically to get it?
4  A. Yes, before they close up.
5  Q. And someone told you that your equipment -- they had
6  your equipment?
7  A. Yes.
8  Q. Who was that?
9  A. Yes. I was told that my equipment was in Logistics
10 --
11 Q. Okay.
12 A. -- but I don't -- I thought I had put the person's
13 name in here, but apparently I didn't.
14 Q. You don't remember who it was at this point in time?
15 A. No, no.
16 Q. That's okay. That's fine. Okay. But you were
17 told. Was that the day before or -- that your equipment was
18 going to be available for you on December the 3rd?
19 A. Right. The day that I went in early?
20 Q. Yes.
21 A. I was told before, right.
22 Q. Okay. And you got everything back -- I'm asking you
23 did you get everything back except for two computer speaks,
24 power inverter and the vehicle cleaning supplies?
25 A. Yes.

Page 43

1  Q. Okay. And then going to item number 8 on December
2  the 5th, 2002, it says when I arrived at FPS office I was
3  approached by FPOD Parry and she gave me a property receipt
4  that's signed and a box of all the missing supplies, is that
5  correct?
6  A. Correct.
7  Q. Okay. So did you get everything back?
8  A. Yes, yes.
9  Q. Okay. You got all the --
10 A. Except for the cleaning supplies.
11 Q. You didn't get the cleaning supplies back?
12 A. No. That was all they had.
13 Q. Okay. And what cleaning supplies were missing?
14 A. You know, like window cleaner. There were the Armor
15 All supplies for the interior, mostly for the interior.
16 Q. Window cleaner, Armor All.
17 A. Yeah.
18 Q. What else?
19 A. That was about it.
20 Q. About how much is that worth?
21 A. And I had a little dust mop that I used to dust my
22 radio off with because the way the radio was set it would
23 collect dust. You have to keep it dusted so it won't
24 accumulate around the buttons and malfunction.
25 Q. Okay. So your window cleaner, Armor All, dust mop.

Page 44

1  What else was missing?
2  A. That was it.
3  Q. Okay. Do you know about how much that was worth?
4  A. No, I don't know. I have no idea.
5  Q. Okay. But other than your window cleaner, Armor All
6  and dust mop you got all your equipment and supplies back, is
7  that correct?
8  A. Right, um-hum.
9  Q. Okay.
10     MS. FIELDS: Mark that, please.
11 (Whereupon, the document that was referred to as Exhibit
12 Number 5 was marked for identification.)
13     BY MS. FIELDS:
14 Q. Okay. I'm showing you Exhibit Number 5 now. If you
15 could just review that document for me, please.
16 A. Okay. You said Number 5, right?
17 Q. Yeah, the document.
18 A. Oh, you're talking about the whole entire document.
19 Q. Yes. Just take a look at it.
20 A. Okay, okay.
21 Q. Okay.
22     (Long pause)
23     MS. FIELDS: I've forgotten the exhibit number.
24 Let's see, exhibit number what?
25     REPORTER: 5.

## Page 45

1  MS. FIELDS: Okay.
2  BY MS. FIELDS:
3  Q. Have you had a chance to look at Exhibit Number 5,
4  Short?
5  A. Yes.
6  Q. Is that your signature on page 2 of the document?
7  A. Yes.
8  Q. Is that dated October the 8th, 2002?
9  A. Yes.
10  Q. And did you read this document on that date?
11  A. Yes.
12  Q. Okay.
13  MS. HARDNETT: Excuse me. We need to take break.
14  It's time to feed the meter.
15  MS. FIELDS: Okay. Okay, we'll take a break.
16  (OFF THE RECORD)
17  (ON THE RECORD)
18  BY MS. FIELDS:
19  Q. Okay and you're still under oath, of course, Mr.
20  Short.
21  A. Okay.
22  Q. Now I think we had just looked at Government Exhibit
23  Number 5 -- Defendant's Exhibit Number 5. I'll give this to
24  our court reporter.
25  MS. FIELDS: And if you could mark this as Exhibit

## Page 46

1  Number 6.
2  (Whereupon, the document that was referred to as Exhibit
3  Number 6 was marked for identification.)
4  MS. FIELDS: Okay. If you could look at Exhibit
5  Number 6 and see if you can identify that document. Do you
6  recognize it?
7  (Long pause)
8  BY MS. FIELDS:
9  Q. Okay. Have you had a chance to review that complete
10  document, Mr. Short?
11  A. Yes, uh-huh.
12  Q. Now Exhibit 6, is this a statement which you gave to
13  the EEO counselor?
14  A. Yes.
15  Q. Okay. And is it initialed by you on each page?
16  A. Um-hum.
17  Q. Is that a yes or a no?
18  A. Yes.
19  Q. Okay. And did you sign it as being true and
20  complete at the end?
21  A. Yes.
22  Q. Is that your signature before --
23  A. Yes.
24  Q. -- before the date, May 1, 2003?
25  A. Yes.

## Page 47

1  Q. Okay. And everything in this document and correct?
2  A. Yes.
3  Q. Looking at page 2 of the document at the bottom,
4  second sentence from the end, it says I made the call to the
5  U.S. Attorney's Office before I was told by Lieutenant Thomas
6  contacted me and stated he wanted me to arrest the tourist
7  with the gun.
8  A. Um-hum.
9  Q. So is that correct?
10  A. Yes.
11  Q. That you had spoken with the U.S. Attorney's Office
12  before Lieutenant Thomas told you to arrest the tourist?
13  A. Yes.
14  Q. Okay. Now you indicate on page 3 that when I
15  returned back to the office, Lieutenant Thomas confronted me
16  and stated that his decision to release the visitor with the
17  gun was improper. Was it his decision -- do you say that his
18  decision was improper or that your decision was improper?
19  A. My decision was improper.
20  Q. Okay. I feel he was making negative statements
21  about the situation in an attempt to provoke me. Could you
22  tell me what happened as best you remember in that
23  conversation with Lieutenant Thomas when you went back to the
24  office?
25  A. Well, Lieutenant Thomas, he's a very intelligent

## Page 48

1  person. He does little things to provoke a officer, and he
2  knew by working with me and he knew how to really pick my
3  nerves. He criticized the incident, the way I handled the
4  incident, but I wasn't supposed to be the arresting officer.
5  Q. Can you tell me what he said?
6  A. Well, he was raising his voice at that time, that I
7  didn't do what he told me to do, and he was my supervisor and
8  he ended me to arrest the man and he wanted me to arrest the
9  man, but, you know -- and I told him it wasn't -- I was just
10  went there as an observing officer, you know, and to make
11  decisions, too, if it was warranted, if a decision was to be
12  made, which I did.
13  Q. And what decision did you make?
14  A. And I contacted the U.S. Attorney because it was a
15  question mark as to whether we should -- this guy was a young
16  guy. Him and his girlfriend had came -- they were tourists.
17  He didn't know the laws of D.C. and he had a -- he was going
18  into the garage of the Ronald Reagan Building and the guy was
19  sweeping the vehicle and checking the vehicle out, and when
20  the -- he told the guy that he had a weapon in the trunk,
21  which he was real nice, you know. He told him he had a weapon
22  in the trunk, which he did, and the weapon wasn't loaded. The
23  ammo was in the glove compartment and the weapon was in the
24  trunk. And he didn't know the D.C. laws concerning a firearm.
25  So I went over there to -- after the officer was dispatched