Case 1:05-cv-01034-RMU    Document 18-35    Filed 09/25/2007    Page 1 of 4

## Page 101

1  Lieutenant Thomas.  It's the last paragraph.  You refer to
2  him?
3      A.  Yes, uh-huh.
4      Q.  You say he is so hard to reason with.
5      A.  Yes.
6      Q.  There is no doubt he refuses to listen to me with an
7  open mind when it comes to my experience and police duties.
8  Then you say failure to follow instructions, number 1, and
9  number 2, disrespectful behavior toward a supervisor comes
10  from the hostile environment he has worked so hard to create
11  over the years, is that correct?
12      A.  Yes.
13      Q.  And in this Exhibit Number 16, you do not deny that
14  you disobeyed his order to arrest --
15      MS. HARDNETT:  Objection.
16      MS. FIELDS:  -- the individual, did you?
17      MS. HARDNETT:  Objection.
18      WITNESS:  No, I did not -- well, I disobeyed his
19  order, yes.
20      BY MS. FIELDS:
21      Q.  You disobeyed it?
22      A.  Yeah, I disobeyed his order because it was given to
23  me.
24      Q.  Okay.  So you did not in Exhibit Number 16 that you
25  disobeyed his order?

## Page 102

1      A.  Right.
2      Q.  And you did not deny in this exhibit that you called
3  him a name, is that correct?
4      A.  That's correct.
5      Q.  Did you call him a dumb black nigger?
6      A.  Yes.
7      Q.  Okay.  And in this letter did you deny that you were
8  AWOL of July the 4th?
9      A.  Yes.
10      Q.  Did you deny it here in Exhibit Number 16?
11      A.  I didn't know I referred to that.  I say yes, I did.
12      Q.  In Exhibit Number 16?
13      A.  Yes.
14      Q.  Did you deny that you were AWOL on July the 4th?
15      A.  Yes.
16      Q.  Where in Exhibit 16 did you --
17      A.  I didn't specifically go --
18      Q.  Where in Exhibit 16 do you refer to July the 4th?
19      A.  I didn't refer to that -- oh, yes.  Yeah, I did, I
20  did.
21      Q.  Where?
22          (OFF THE RECORD)
23          (ON THE RECORD)
24      MS. HARDNETT:  Would you like a dry chair?
25      WITNESS:  No, no, that's all right.  I just want to

## Page 103

1  --
2      BY MS. FIELDS:
3      Q.  We were talking about July the 4th, 2002.  Where in
4  --
5      A.  Okay.
6      Q.  -- Exhibit 16 do you deny that you were AWOL on July
7  the 4th?
8      A.  No.  They put me down for AWOL, but I -- they gave
9  it to me.  It was given to me.
10      Q.  Do you deny in Exhibit Number 16 that you were not
11  AWOL on July the 4th?
12      A.  No, I was not.
13      Q.  On this document where do you refer to July the 4th,
14  2002?  You did not refer to July the 4th, 2002 in Exhibit 16,
15  did you?
16      A.  It says -- oh, I see what you're saying.  Oh, I was
17  looking at the date.  I was looking at it wrong.  I'm sorry.
18      Q.  Okay.
19      A.  Okay, I'm sorry.
20      Q.  Should I say the question one more time?
21      A.  No.  It's there.
22      Q.  Read to me where it says July the 4th, 2002 on
23  Exhibit 16, please.
24      A.  I don't have that statement.
25      MS. HARDNETT:  Objection.  You're not going to

## Page 104

1  badger him.
2      MS. FIELDS:  Well --
3      MS. HARDNETT:  He's answered the question.
4      MS. FIELDS:  Ma'am, if you have an objection --
5      MS. HARDNETT:  -- and I'm noting he's answered the
6  question.
7      MS. FIELDS:  Step outside, please, sir.  Step
8  outside, please.
9      MS. HARDNETT:  He doesn't have to.  This is the end
10  of it.
11      MS. FIELDS:  Okay.  This is not the end of this.
12  I'm not badgering anybody.  I'm asking questions.  Step
13  outside, please, for a minute.  I'm not badgering anybody.
14  I'm asking questions.
15      MS. HARDNETT:  You will not raise your voice with my
16  client.
17      MS. FIELDS:  I'm not raising my voice.  I'm asking
18  questions.
19      MS. HARDNETT:  You can ask him questions.
20      MS. FIELDS:  If you don't like the tone of my voice,
21  that's your problem.
22      MS. HARDNETT:  When your tone changes from one level
23  to another level and it's obvious that you're trying to
24  intimidate him and badgering him, I have the right to object
25  to that.  What I'm asking you to do --

| Page 105 | Page 107 |
|---|---|

**Page 105**

1      MS. FIELDS: What I'm stating -- my tone of voice is
2  on the record.
3          MS. HARDNETT: What I'm asking you to do, what I'm
4  asking you to do is to speak to my client -- if you have
5  questions, to address him in a civilized manner and tone, not
6  to raise your voice to badger and intimidate him. That's what
7  I'm asking you to do, counselor.
8      MS. FIELDS: Are you through with your objection?
9      MS. HARDNETT: That's what I'm asking you to do,
10  counselor.
11      MS. FIELDS: Would you have your client come in,
12  please?
13      MS. HARDNETT: Do you want a dry chair? Do you have
14  a dry chair that you can give him?
15      REPORTER: He can take this one.
16      MS. HARDNETT: Well, then you're going to have a wet
17  chair.
18      WITNESS: You're going to have a wet chair. No, I'm
19  already wet, so it's --
20      MS. FIELDS: Why don't you step right out there?
21  There should be a chair right where the secretary is.
22      MS. HARDNETT: Mr. Short, you can have this chair.
23  I got a little weight. I'm not like you. He's going to get
24  another chair.
25      WITNESS: Oh, okay, okay.

**Page 106**

1      MS. FIELDS: Now do you understand my question, Mr.
2  Short? My question is -- let me make sure you understand it.
3  My question is read to me on Exhibit Number 16 where you refer
4  to July the 4th, 2002.
5      MS. HARDNETT: Objection.
6      WITNESS: This --
7      BY MS. FIELDS:
8      Q. Excuse me?
9      A. That is -- the statement is -- you referred to July
10  the 4th. You're talking about the leave that I put in for
11  July 4th, are you referring to that?
12      Q. Yes.
13      A. Yes. Okay. That's what you want to know -- this is
14  what this is concerning, the July 4th leave? I done got --
15  I'm a little confused here now --
16      Q. Okay.
17      A. -- because on the date -- I'm confused here because
18  I don't know if I submitted this with the dates in error or
19  what because that don't look right. This was June -- he
20  didn't never bring that to my attention when I talked to him.
21  Yeah, I messed up there.
22      Q. This relates to -- this says on June 29th I
23  requested emergency leave from my supervisor, Lieutenant
24  Thomas, so I could take my wife to the hospital, correct?
25      A. Um-hum.

**Page 107**

1      Q. Okay. How long did Lieutenant Thomas continue to be
2  your supervisor?
3      A. What do you mean continue? You mean after the
4  incidents?
5      Q. Well, how long -- yeah, how long was he your
6  supervisor?
7      Q. Until the day I retired.
8      A. Was he always your direct supervisor?
9      A. Yes.
10      Q. Who was Rusty West? Was he ever your supervisor?
11      A. Yes.
12      Q. When was he your supervisor?
13      A. He was a sergeant, up until the day he retired.
14      Q. When was that?
15      A. I don't remember when he retired, maybe 2003.
16      Q. Well, was he in the same relation to you as
17  Lieutenant Thomas in terms of supervision? Was he -- was
18  Lieutenant Thomas your direct supervisor?
19      A. Yeah, he was the lieutenant and Sergeant West was a
20  sergeant.
21      Q. Okay. Tell me how that works.
22      A. Well, you have a sergeant and a lieutenant and you
23  have a captain.
24      Q. Okay. So was it always -- so --
25      A. You got three -- I had three supervisors. I had a

**Page 108**

1  sergeant, I had a lieutenant, and I had a captain.
2      Q. So is the sergeant your first line supervisor?
3      A. First line, yes.
4      Q. Then who's your second line supervisor?
5      A. Lieutenant.
6      Q. And the third line supervisor?
7      A. Captain Mitchell.
8      Q. Okay. Now after you filed your second complaint of
9  discrimination, GAS-14, pertaining to the detail of, I think,
10  Tally, Corporal Tally --
11      A. Yes.
12      Q. Okay. After you filed that complaint, did you file
13  any further EEO complaints?
14      A. Concerning Corporal Tally?
15      Q. Yes, after those complaints concerning Corporal
16  Tally.
17      A. No.
18      Q. Did you file any complaint concerning Lieutenant
19  Thomas following your complaint concerning Lieutenant --
20  Corporal Tally's promotion?
21      A. Come at me again -- come again now.
22      Q. In 2003 you filed a complaint concerning Corporal
23  Tally.
24      A. Right.
25      Q. After you filed the complaint concerning Corporal

## Page 109

1  Tally, did you file any complaint alleging discrimination
2  concerning Lieutenant Thomas after that?
3       A. No.
4       Q. Now you retired in 2005.
5       A. Right.
6       Q. Okay. Now -- and you're saying that -- we talked
7  about various acts that were led up to your suspension --
8       A. Right.
9       Q. -- and the letters of suspension.
10      A. Yes.
11      Q. We talked about once you came back from suspension
12 what happened with your vehicle and your equipment, correct?
13      A. Yes.
14      Q. And then we talked about the -- there were the two
15 deployments that you didn't go on. There were two --
16      A. Yes.
17      Q. And then there was the promotion of Corporal Tally.
18      A. Right.
19      Q. Okay. Now other than those incidents that were in
20 your complaints, is there anything else that you're claiming
21 caused you to retire in 2005?
22      A. I would say I went -- let's see, like through a
23 change for nine years of stress and not being promoted,
24 working as a supervisor, and not only did I work as a
25 supervisor in this area, I was on the floor. I worked as a

## Page 110

1  supervisor. They knew that. And I never had any complaints
2  on my supervision. I received awards, plaques, on deployment,
3  when I was on deployment. I made arrests when I was on
4  deployment. My arrests were good, no complaints whatsoever.
5       Lieutenant Tally had never been on deployment, never
6  had the experience. Two guys made sergeant when I should
7  have. They'd never been on deployment. They never
8  experienced what I have experienced, and they knew this, you
9  know.
10      I was always confronted by my coworkers about how
11 they're treating me, and they couldn't see how I could stay
12 there and take that. I had to eat crow every day for nine
13 years. For nine years I ate crow every day.
14      Q. When you say you ate crow, what do you mean?
15      A. I had to put on a false face. I had to take
16 everything they dished out to me. I couldn't show no emotion
17 whatsoever, okay, and that's not easy. I had to be strong to
18 do that.
19      Q. Well, let me ask you, sir, when you say you ate
20 crow, concerning what?
21      MS. HARDNETT: Objection. He responded to that
22 question, counselor.
23      WITNESS: well, like I said, I couldn't show no
24 emotion or fear, which was there, from reprisal. I just
25 couldn't show it. In other words, I had to deal with them.

## Page 111

1       BY MS. FIELDS:
2       Q. What was the reprisal?
3       A. Well, I would say after this particular incident
4  with the lieutenant --
5       Q. With Lieutenant Tally?
6       A. No, with the EEO filing.
7       Q. After your EEO filing concerning --
8       A. Right, the first incident.
9       Q. -- the first EEO filing?
10      A. Right, the first.
11      Q. After the first EEO filing what happened?
12      A. Right, and I was sort of like a marked person, you
13 know what I mean, so that's when a lot of this -- that's when
14 everything really hit the fan. When I put in for my first
15 promotion, it was given to another officer.
16      Q. When was that that you put in for your first
17 promotion?
18      A. I don't have the exact date -- I mean month or year,
19 but that guy worked my shift. He was a drunk. And I actually
20 had to do a lot of his work for him because he didn't know the
21 procedures.
22      Q. When you say you first put in for your first
23 promotion, was that before or after 2002?
24      A. I think it was before.
25      Q. Okay.

## Page 112

1       A. It was before. And --
2       Q. And did you file a discrimination claim concerning
3  that person getting a promotion and you not?
4       A. No, no, no, no, because I said when the next one
5  come around I'm going to put in for it, but that's when -- I
6  put in the for the second one, didn't get it.
7       Q. When did you put in for your second promotion?
8       A. It was during 2005 -- not 2005. It was when I was
9  in Puerto Rico because I was in Puerto Rico when they sent the
10 information to me. That's where I was supervising a site, the
11 largest site in Puerto Rico, two shifts of employees. I had
12 about ten officers under me.
13      Q. What year was that?
14      A. And I set up the security there with FEMA and I did
15 that for 90 days.
16      Q. What year was that, sir?
17      A. That was during -- oh, that was like -- oh, that was
18 before -- that was -- I think it was something like the late
19 '90s.
20      Q. Late '90s?
21      A. Yeah.
22      Q. And did you put in a discrimination claim concerning
23 not getting that promotion in the late '90s?
24      A. No.
25      Q. Okay.

Page 113

1    A. No.
2    Q. Anything else, sir, that you consider an act of
3 reprisal?
4    A. Well, up until the day I retired. You know, they
5 were given temporary promotions for Acting Sergeant, 90 day
6 temporary promotions. I didn't get 90 days. I didn't even
7 get 90 days. Ninety days you get with pay. I didn't even get
8 90 days.
9    Q. Were these temporary promotions which were outside
10 of Homeland Security?
11   A. Yes, but Homeland Security wasn't there when they
12 started that program. They were still in the GSA.
13   Q. Well, then Corporal Tally got her promotion. Wasn't
14 that a detail over to Homeland Security?
15   A. Yeah, yeah, that was Homeland, yes, within Homeland,
16 yes.
17   Q. Okay. Now you put in a discrimination claim
18 concerning the promotion of Corporal Tally.
19   A. Right, uh-huh, yes.
20   Q. Okay. And so were there other promotions that were
21 done that you feel were retaliation against you, temporary
22 promotions?
23   A. Well, the one that hurt me the most was Lieutenant
24 Tally because, see, the other guys that received the
25 promotions, they had a lot of time on the force, too. They

Page 114

1 were in my age group. But Lieutenant Tally, when they brought
2 her in, she was a lot younger. She was --
3    Q. So it was her temporary promotion that really
4 bothered you?
5    A. Right, yes.
6    Q. Okay. Were any racial slurs ever used against you
7 by Lieutenant Thomas?
8    A. Not to -- well, no, not that I know of.
9    Q. Did he ever make any slurs concerning your age?
10   A. Not that I recall. He might have, but -- I mean,
11 you know, you work with a person every day and I had to psych
12 myself into blocking things out. I had to block a lot of this
13 out of my mind concerning this case, this whole deal, and
14 yesterday it was brought back, you know, and it's a stressful
15 thing, you know, that I had to deal with this. Now -- but
16 Lieutenant Thomas, a lot of things about him, concerning him,
17 I had to really block in order to deal with him every day.
18   Q. Well, sir, my question was did he ever make any
19 slurs --
20      MS. HARDNETT: Objection.
21      MS. FIELDS: -- to you concerning your age?
22      MS. HARDNETT: Objection. I think he's trying to
23 answer the question, counselor. Would you let him finish,
24 please?
25      WITNESS: If he did, I wouldn't recall it. I know

Page 115

1 he had had conversation with other officers concerning me, you
2 know, so exactly what he was saying, I don't recall, about me.
3 Now Lieutenant Thomas, I had to try to establish a rapport
4 with him so that I could work there without any fear every
5 day. That's where eating crow come in.
6      BY MS. FIELDS:
7    Q. Fear of what, sir?
8    A. Reprisal.
9    Q. For what?
10   A. From this incident here. And --
11   Q. Well, what acts of reprisal did Lieutenant Thomas do
12 towards you?
13   A. Well, this whole case here, I've been on that force
14 for 37 years. I never disrespected a supervisor. I have a
15 track record. You talk to any officer, they will tell you no,
16 that's not him, that's not Short, and they will tell you about
17 that lieutenant. They'll say he's a snake in the grass.
18      Now I'd never been suspended for anything, never
19 received a infraction for anything. In 37 years that's my
20 first one. This whole initial case was on one man. I can
21 work with anybody. I can deal with anybody. I've worked with
22 guys that -- on the force, supervisors, the other guys
23 couldn't deal with. Lieutenants, Lieutenant Holmes, I was
24 telling you about, was one and he was a toughy, but I had no
25 problems. I could deal with it.

Page 116

1    Q. So --
2    A. But I had nothing -- as far as work relationships, I
3 never disrespected them or whatever. Now there were other
4 supervisors hard to deal with. Captain Simms was
5 another one. Nobody liked him.
6    Q. Excuse me, sir. Let's just stick with Lieutenant
7 Thomas, okay?
8    A. Okay. Okay.
9    Q. So you're saying the acts of -- the act of reprisal
10 from Lieutenant Thomas pertained to your being suspended, is
11 that --
12   A. Yes.
13   Q. Is there anything else other than the suspensions
14 that you consider acts of reprisal by Lieutenant Thomas?
15   A. No. I just --
16      MS. FIELDS: Okay.
17      MS. HARDNETT: I have some questions on that. Could
18 you pass me the stack of exhibits, please.
19      REPORTER: They're in reverse order now.
20      MS. HARDNETT: Pardon?
21      REPORTER: They're in reverse order now.
22      MS. HARDNETT: Yes. That's what I'll do. I'll just
23 deal with it in reverse order.
24            CROSS EXAMINATION
25      BY MS. HARDNETT: